**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MADWELL LLC,<br><br>*Alleged Debtor*. | <br><br>Chapter 7<br><br>Case No. 1-25-45169-ESS |

**ALLEGED DEBTOR'S OPPOSITION TO INVOLUNTARY CHAPTER 7 PETITION, MOTION TO DISMISS, AND REQUEST FOR DISCOVERY**

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................................ iiiii

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTS ........................................................................................ 4

A. Madwell's Business and Ultimate Decline ........................................................................................ 4

B. The Fraud Investigation ........................................................................................ 5

C. The Bank of America Judgment and Subsequent Outreach from Petitioners ............... 9

D. The Petition Includes Non-Qualifying Debts ........................................................................................ 13

E. Joinder of New Petitioners ........................................................................................ 14

LEGAL STANDARD ........................................................................................ 15

ARGUMENT ........................................................................................ 18

I. The Court Should Dismiss the Petition Because It Was Filed in Bad Faith and/or Constitutes an Abuse of the Bankruptcy Code. ........................................................................................ 20

II. The Court Should Dismiss the Petition Because the Interests of Legitimate Creditors and the Alleged Debtor Would Be Better Served by Dismissal. ........................................................................................ 24

III. Madwell Should Be Permitted to Seek Discovery. ........................................................................................ 25

CONCLUSION ........................................................................................ 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basin Elec. Power Co-op. v. Midwest Processing Co.*,
769 F.2d 483 (8th Cir. 1985) .................................................. 19

*Forever Green Athletic Fields, Inc. v. Dawson*,
514 B.R. 768 (E.D. Pa. 2014) .................................................. 19

*In re Bayshore Wire Products Corp.*,
209 F.3d 100 (2d Cir. 2000) .................................................. 15

*In re Centennial Ins. Associates, Inc.*,
119 B.R. 543 (Bankr. W.D. Mich. 1990) .................................................. 19

*In re CNG Foods LLC*,
2020 WL 4219679 (Bankr. E.D.N.Y. July 13, 2020) .................................................. 15, 16

*In re Forever Green Athletic Fields, Inc.*,
804 F.3d 328 (3d Cir. 2015) .................................................. 3, 15, 16, 17, 19, 20, 21, 23

*In re Murray*,
900 F.3d 53 (2d Cir. 2018) .................................................. 3, 17

*In re Reid*,
773 F.2d 945 (7th Cir. 1985) .................................................. 15

*In re Smith*,
507 F.3d 64 (2d Cir. 2007) .................................................. 17

**Statutes**

11 U.S.C. § 303(b)(1) .................................................. 15

11 U.S.C. § 303(i)(2) .................................................. 15

11 U.S.C. § 707(a) .................................................. 17

11 U.S.C. § 305(a)(1) .................................................. 15, 17, 24

**Other Authorities**

*Bankruptcy Law Manual* § 14:13 (5th ed., Dec. 2025 Update) .................................................. 19

The alleged debtor, Madwell LLC ("Madwell" or the "Company"), submits this Opposition, Motion to Dismiss, and Request for Discovery in response to the Chapter 7 Petition (the "Petition") filed by the petitioning creditors, Laundry Design LLC ("Laundry"), Freelunch Forever LLC ("Freelunch"), Kruh in Vino, Storitvene Dejavnosti, D.O.O. ("KIV"), Hiteny S.A. ("Hiteny"), Coupe Studious Music & Sound Design, LLC ("Coupe"), and Naujelis Enterprises Inc. ("Naujelis") (collectively, the "Petitioners").

## PRELIMINARY STATEMENT

No reasonable dispute can exist that Petitioners filed the Petition to try to extract an improper *quid pro quo* payment from Madwell's principal, Christopher Sojka. Before Petitioners filed the Petition, they used the threat of filing it to try to extract a payment from Mr. Sojka. When that failed, Petitioners came up with an alternative way to misuse the bankruptcy process to advance their individual interests: they filed the Petition and then sought to use its filing — ***coupled with the prospect of its dismissal if Mr. Sojka were to agree to pay them using his personal assets for alleged debts of Madwell for which he had no personal liability*** — as a further means to extract an improper payment from Mr. Sojka. While misusing the bankruptcy process in the above ways, Petitioners simultaneously ignored Madwell's pre-Petition offer (which remains open) to provide them with full transparency regarding the Company — including its financials (past and present) — to alleviate any concerns they may have about whether Mr. Sojka is acting in the best interests of the Company's creditors.

Petitioners' improper use of the Petition to try to extract a *quid pro quo* payment from Mr. Sojka is confirmed by the parties' written communications submitted herewith, including a post-Petition text exchange on November 11, 2025, between Brian Naujelis, the principal of one of the Petitioners, Naujelis, and Mr. Sojka. The text exchange involved an airplane. A few days before Petitioners filed the Petition, Petitioners' counsel sent emails on October 21 and 22, 2025, to

Madwell's counsel inquiring about various assets, including an airplane. Consistent with Madwell's prior representation to Petitioners' counsel that it would be fully transparent with them, on October 23, 2025, Madwell's counsel responded to the inquiries, conveying his understanding that the funds Mr. Sojka used to obtain his interest in the assets were personal, such that none of the assets, including the airplane, could be characterized as a Madwell asset. Petitioners' counsel did not dispute that response or inquire further. Indeed, after Madwell's counsel conveyed the foregoing information, no further substantive communication occurred between counsel until November 10, 2025, when Petitioners' counsel emailed Madwell's counsel stating, "I gather your client (Sojka) sold the jet. You have a moment to discuss?"

The next day, November 11, 2025, before counsel could connect, the principal of Petitioner Naujelis, Brian Naujelis, texted Mr. Sojka (unsolicited and without authorization from Madwell's counsel) stating, ***"The jet has been sold. When should I expect payment?"*** After Mr. Sojka responded by pointing out that Mr. Naujelis is "participating in a motion to force Chapter 7 liquidation of Madwell," Mr. Naujelis stated, ***"It could go away if we were to get paid what we're rightfully owed."*** The next day — when Petitioners' counsel and Madwell's counsel connected — Petitioners' counsel reiterated the same message. He explained that he wanted to discuss with Madwell's counsel that (i) this bankruptcy proceeding was in the gap period where it could still be dismissed, and (ii) although Petitioners could not at that point seek (and were not seeking) a payment from Madwell directly, a third party (*i.e.*, Mr. Sojka) could pay to get Madwell out of bankruptcy.

Based on those communications, no reasonable dispute can exist that Petitioners first threatened to file the Petition — and then filed it — to try to extract an improper *quid pro quo* payment from Mr. Sojka. Nor can any reasonable dispute exist that such conduct — particularly

when considered in light of additional evidence regarding the Petition's suspicious timing and Petitioners' failure to conduct a reasonable factual investigation before filing the Petition — renders the Petition objectionable and subject to dismissal. Indeed, under the law of this Circuit and others, an involuntary petition that reflects an "[i]nappropriate use of the Bankruptcy Code" is subject to dismissal — even if it meets the statutory criteria for an involuntary petition. *In re Murray*, 900 F.3d 53, 60 (2d Cir. 2018); *see In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). Accordingly, the Petition should be dismissed.

Importantly, however, Madwell is not objecting to the Petition and moving for its dismissal in order to avoid paying its creditors. Nor is Madwell seeking to avoid full transparency into its pre-Petition or post-Petition activities. The opposite is true, and Madwell's actions to date confirm that. Before Petitioners filed the Petition, Madwell offered to provide them with full transparency with respect to its financials (past and present). That offer remains open.

Madwell, through Mr. Sojka, is committed to doing everything it reasonably can to put itself in a position to pay every one of its legitimate creditors. That is why it is objecting to the Petition; it does not want the Petition to interfere with or derail that effort. In the wake of Madwell's financial collapse earlier this year, Mr. Sojka (and others assisting him) began to uncover in the Company's internal records evidence that appears to show that a multi-year fraud was committed against Madwell, pursuant to which many millions of dollars seemingly were diverted out of the Company by individuals formerly associated with it. Undersigned counsel — the former Co-Chief of the Civil Frauds Unit of the U.S. Attorney's Office for the Southern District of New York — was retained to assist Madwell in investigating the potential fraud, and to determine whether grounds exist to pursue claims against anyone who may unlawfully have profited at Madwell's expense (the "Investigation").

As described herein, that Investigation has advanced meaningfully, uncovering seemingly significant red flags of potential fraud. Those red flags include not only evidence indicating that many millions of dollars may have been diverted out of Madwell, but also evidence of how such money may have been diverted. The potential claims relating to such diversion are Madwell's only (potentially) meaningful asset. If Madwell were able successfully to pursue any such claims, it would use the resulting recoveries to pay its legitimate creditors. Paying Madwell's legitimate creditors is of paramount importance to Mr. Sojka. Accordingly, Madwell is objecting and moving to dismiss the Petition because it does not want the Investigation, which is being conducted for the potential benefit of all creditors, to be delayed or otherwise disrupted by the handful of Petitioners who put their purported interests above all other creditors and filed the Petition for the self-serving and improper purpose of seeking to extract a payment from Mr. Sojka for themselves.

That said, Madwell remains willing to cooperate with Petitioners and do what it offered to Petitioners' counsel before Petitioners filed the Petition: share with them information they seek about the Company (historical and present) to satisfy them that Mr. Sojka is acting in the best interests of the Company's creditors. Madwell is willing to be an open book, and is amenable to other reasonable proposals Petitioners may have. What Madwell is not willing to do, however, is permit Petitioners to disrupt the work it is doing to try to make all creditors whole.

## RELEVANT FACTS

### A. Madwell's Business and Ultimate Decline

Madwell, which previously operated as a Brooklyn-based independent ad agency, was co-founded in 2010 by Christoper Sojka and another individual. Mr. Sojka served as the Chief Creative Officer of the Company and was responsible for the big ideas behind the Company's ad campaigns and other branded content for Madwell's many clients. From Mr. Sojka's perspective, by the mid-2010s, the Company was succeeding by every possible qualitative metric: Madwell

was winning new business, winning awards, and building brands from start-ups to international household names. Mr. Sojka was not, however, responsible for or actively involved with the Company's finances, and his understanding of them was based primarily on what others told him and his review of the Company's annual tax filings — he trusted other Madwell employees to handle the Company's money.

Following a dispute with his co-founder, in October 2024, Mr. Sojka bought out his co-founder's share of the Company and became Madwell's sole owner. At that time, Mr. Sojka understood that the Company had been having some liquidity issues, but he also understood them to be surmountable. Based on the Company's annual tax filings and his knowledge of the business he generated for Madwell, he believed it was a viable company with a bright future. After he acquired full ownership of it, however, Mr. Sojka discovered that the financial condition of the Company was not what he understood it to be. Madwell was in danger of insolvency, and despite Mr. Sojka's best efforts in late 2024 and early 2025, he was unable to avoid that result.

Madwell ceased operations on April 30, 2025. Since April 30, the Company has not engaged in any business activities. Madwell's activities since April 30 have been limited to winding down its operations and investigating the circumstances surrounding its financial collapse in order to confirm what happened and engage in efforts to get legitimate creditors paid.

**B. The Fraud Investigation**

In the aftermath of Madwell's collapse and prior to the filing of this Chapter 7 proceeding, Mr. Sojka and others assisting him, including Robert Delgado, who served as Madwell's Chief Financial Officer from March 11, 2025 until Madwell's collapse, uncovered evidence in the Company's internal records appearing to show that a multi-year fraud had been committed through which a substantial amount of money had seemingly been diverted out of the Company by individuals formerly associated with it. Undersigned counsel was retained to assist Madwell in

investigating the seeming fraud (the "Investigation"). The resulting Investigation has advanced significantly.

Indeed, to date, the Investigation has uncovered seemingly significant red flags indicative of potential fraud — including substantial discrepancies across different Madwell financial records concerning Madwell's annual revenue received and expenses paid. Madwell's third-party prepared financial records contain figures for its annual revenue received and expenses paid that are very different — and substantially lower — than the corresponding figures reflected in its bank statements and internally prepared financial records. For example, from 2018 through 2023, Madwell's third-party prepared tax returns and profit and loss ("P&L") statements report significantly less revenue received by Madwell as compared to Madwell's bank statements and internally prepared P&L statements. *See* Declaration of Robert Delgado ("Delgado Decl.") at ¶ 15.

Specifically, during the 2018 to 2023 period, the inflows to Madwell's Bank of America account (the "BOA Account") — as reflected in the bank statements for the BOA Account[1] — exceeded the total revenue received reported on Madwell's tax returns by approximately ***$187 million***. *Id.* at ¶ 16. This discrepancy between the inflows to Madwell's bank account and the Company's reported revenue in its third-party prepared financials exists each year from 2018 through 2023. *Id.* For example, in 2019, Madwell's Form 1065 (U.S. Return of Partnership Income) reported approximately ***$23 million*** in total gross revenue received. *Id.* The same year, the BOA Account reflected approximately ***$52 million*** in inflows to Madwell. *Id.* In other words,

[1] The BOA Account statements referenced herein are for the Madwell bank account ending -2105. Prior to becoming Madwell's sole owner in October 2024, Mr. Sojka understood the BOA Account to be Madwell's only bank account. The Investigation, however, has uncovered evidence indicating that during that period, additional Madwell bank accounts may have existed.

comparing the inflows from the BOA Account in 2019 to the inflows from the tax return for 2019 reflects nearly $30 million in unaccounted-for money that was paid into the Madwell BOA Account.

For each year from 2018 through 2023, the below chart compares the revenue received as reflected in Madwell's (i) third-party prepared tax returns, (ii) third-party prepared P&L statements, (iii) internally prepared P&L statements, and (iv) BOA Account bank statements. *Id.*

| **Madwell Revenue Comparison, 2018 – 2023 (Dollars)[2]** | | | | | | |
|---|---|---|---|---|---|---|
| **Source** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** |
| Third-Party Prepared Tax Returns | 12,916,335 | 22,591,947 | 22,045,456 | 23,535,448 | 33,630,033 | 23,246,885 |
| Third-Party Prepared P&L Statements | N/A | N/A | 24,392,167 | 31,971,218 | 35,826,642 | 28,134,124 |
| Madwell Internally Prepared P&L Statements (Cash Basis) | 25,353,074 | 41,308,938 | 46,795,278 | 55,988,986 | 66,332,504 | 36,323,563 |
| Madwell Internally Prepared P&L Statements (Accrual Basis) | 33,077,225 | 43,861,298 | 40,226,401 | 63,094,722 | 57,851,839 | 41,439,990 |
| Madwell BoA Account Bank Statements | 31,202,374 | 52,014,118 | 54,451,330 | 71,874,902 | 67,842,590 | 47,600,298 |

Comparing the figures in the above chart reveals that Madwell's revenue received as reflected in the BOA Account bank statements (i) significantly exceeds the revenue received as reflected in the internally prepared P&L statements and (ii) dwarfs the revenue received as

[2] The figures contained in the chart are derived from Madwell's third-party prepared tax returns, third-party prepared P&L statements, internally prepared P&L statements, and BOA Account bank statements, respectively. *See* Delgado Decl. at ¶ 16. Third-party P&L statements were not prepared for Madwell in 2018 and 2019. *Id.*

reflected in the third-party prepared tax returns and P&L statements. While functional differences between these records may potentially explain portions of these discrepancies, the magnitude of the discrepancies suggests that a significant amount of the revenue received by Madwell was diverted out of Madwell — without the money being reflected in the Company's financials. Comparing the revenue received as reflected in the BOA Account bank statements against the revenue received as reflected in the third-party prepared tax returns, the delta between the revenue received is: approximately ***$18 million*** in 2018; approximately ***$29 million*** in 2019; approximately ***$32 million*** in 2020; approximately ***$48 million*** in 2021; approximately ***$34 million*** in 2022; and approximately ***$25 million*** in 2023.[3]

The Investigation also has uncovered another set of internal financial records — maintained in a folder marked as "Private" on Madwell's server (the "Private Records") — that reports revenue received figures generally consistent with what ultimately was reported in the Company's internal P&L statements. *Id.* at ¶ 17. For example, for 2019, the Private Records reflect Madwell receiving approximately ***$44 million*** in revenue — which is about $21 million more than the amount reported on Madwell's tax return (approximately $23 million) and about $8 million less than the total deposits in the BOA Account (approximately $52 million) for that same year. *Id.*

In addition to uncovering evidence indicating that millions of dollars may fraudulently have been diverted out of Madwell, the Investigation also has uncovered evidence reflecting how the money may have been diverted. *Id.* at ¶ 18. In an abundance of caution, Madwell is not disclosing the details of such evidence in this filing to avoid the possibility that a disclosure here

[3] These annual approximate discrepancies add up to $186 million, compared to the total approximate discrepancy amounts set forth above of $187 million. The $1 million delta is attributable to rounding.

could lead to relevant evidence in the possession of third parties being compromised, but it is prepared to provide such details to the Court on request.

Other indicators of potential fraud include anomalies in Madwell's internal records with respect to payments to third-party vendors, including, for example, (i) a payment to a vendor that is not tied to any underlying invoice for services provided and (ii) a duplicative payment to a vendor that appears to have been processed multiple times. *Id*. at ¶ 19. Based on the records, some third-party vendors may have received payments to which they were not entitled, Madwell's records may have been manipulated to make it appear that way, or some other explanation may exist for the seeming anomalies.

By way of example, Madwell has identified a September 2024 invoice from Petitioner Laundry for $356,250, that Madwell's bill-pay software reflects was paid twice. *Id*. at ¶ 20. One entry in the bill-pay records appears to reflect that a single payment of $356,250 was made to Laundry on September 22, 2024. *Id*. Another entry in the same records, however, appears to reflect that four additional payments totaling $356,250 were made to Laundry on the same date. *Id*. Notably, if Madwell did in fact pay Laundry $356,250 twice, as its records appear to reflect, then Laundry's claim (for $213,010) would be fully contestable.

**C. The Bank of America Judgment and Subsequent Outreach from Petitioners**

While undersigned counsel has been conducting the Investigation, undersigned counsel also has been interacting with creditors of Madwell. To that end, in late September 2025, undersigned counsel reached out to counsel for Bank of America ("BOA") in connection with a case that BOA had brought against Madwell and several of its affiliates to recover funds BOA had loaned to Madwell. *See Bank of America, N.A. v. Madwell LLC*, 1:24-cv-6005 (E.D.N.Y.) (the "BOA Matter"). By that time, BOA had obtained a decision in its favor, and consistent with that decision, was seeking to have a judgment entered against Madwell in the amount of $4,100,359.81

plus interest. [BOA Matter, Dkt. 43.] On October 6, 2025, undersigned counsel substituted his appearance for Madwell's prior counsel in the BOA Matter. Four days later, without undersigned counsel raising any new objections and merely reserving Madwell's rights in connection with the previously-issued decision in BOA's favor, the court entered a judgment against Madwell in the above amount. [BOA Matter, Dkt. 48.]

On October 8, 2025, just two days after undersigned counsel entered his appearance in the BOA Matter and while BOA was waiting for its judgment to be entered, Petitioners' counsel first contacted undersigned counsel by way of a letter sent via email, which demanded immediate payment of $563,859.10 allegedly owed to Petitioners by Madwell. Declaration of Christopher B. Harwood (the "Harwood Decl."), Ex. 8. The letter stated that if payment was not received by Petitioners' counsel by October 15, 2025:

> [O]ur firm will take appropriate actions to enforce our clients' contractual rights and to ensure that Madwell is not improperly favoring other creditors. **TO THAT END, WE ARE PREPARED TO PETITION THE BANKRUPTCY COURT TO PLACE MADWELL INTO AN INVOLUNTARY CHAPTER 7 PROCEEDING.**

*Id.* at 2. The letter enclosed a draft copy of the Petition and stated that Petitioners' counsel planned to file the Petition as early as October 17, 2025. *Id.* at 3–11.

Petitioners' counsel and undersigned counsel had an initial conversation by phone on October 15, 2025, during which undersigned counsel explained that Madwell lacked assets sufficient to pay his clients' claims, but that undersigned counsel was conducting an investigation to determine whether a fraud had occurred at Madwell and, if so, whether it might be possible to recover assets for the benefit of Madwell's creditors. Harwood Decl. at ¶ 5. Undersigned counsel made clear that it was too early to say whether the investigation would pan out and he was not in a position to attribute potential liability to anyone, but generally speaking, he believed the investigation to be worthwhile and asked Petitioners' counsel not to file the instant Petition so as

not to disrupt the investigation. *Id*. In connection with that request, undersigned counsel offered to provide Petitioners with full transparency into Madwell's financials and financial condition — including by producing Madwell's financials to them — such that they would obtain the same insight into the Company as would be revealed through a bankruptcy. *Id*. The call concluded with the parties discussing what type of financial information Petitioners might be interested in obtaining and when might work for a follow-up call. *Id*.

The next day, Petitioners' counsel emailed undersigned counsel, stating that Petitioners were "not interested in being part of any investigation or liquidation process where Mr. Sojka has any involvement," that Petitioners were "willing to extend the deadline from [their] demand letter to . . . October 22[] as a final deadline to reach ***some sort of agreement as to a payment to our clients [i.e., Petitioners]***," and that Petitioners' counsel did not "see much point in having a further call" if by October 22 "***there is no offer on the table for our group [i.e., Petitioners] — either cash, or some kind of accelerated interest in a third party asset.***" Harwood Decl., Ex. 9 at 11 (emphasis added).

Undersigned counsel responded by email suggesting a call to discuss, in response to which Petitioners' counsel emailed back, stating: "Before we jump on another call, we'd like a proposal to take to our clients. ***Money talks. Your client has assets.***" *Id*. at 9 (emphasis added). When undersigned counsel responded by email stating, among other things, that "Madwell is not in a position to make a monetary proposal" to Petitioners, Petitioners' counsel responded by emails dated October 21 and 22 with questions about certain properties, assets, and entities, including an airplane. *Id*. at 6–8. By email dated October 23, undersigned counsel responded to the questions, including by conveying his understanding that the airplane and other assets about which Petitioners' counsel had inquired were neither a source of liquidity to Mr. Sojka personally nor

characterizable as assets of Madwell. *Id.* at 4–5. Undersigned counsel offered to schedule time to discuss the questions and his responses in more detail. *Id.* at 4.

Petitioners' counsel did not respond to the October 23 email, and instead, on October 27, 2025, filed the instant Chapter 7 Petition against Madwell, alleging claims totaling $563,859.10, with each respective Petitioner's claim as follows: (i) Laundry, $213,010.00; (ii) Freelunch, $10,149.10; (iii) KIV, $50,000.00; (iv) Hiteny, $213,650.00; (v) Coupe, $59,050.00; and (vi) Naujelis, $18,000.00. [Dkt. 1.] Petitioners' counsel emailed a copy of the Petition to undersigned counsel on October 29, 2025.

Counsel for Petitioners and Madwell did not substantively communicate again until November 10, 2025, when Petitioners' counsel emailed undersigned counsel stating, "I gather your client (Sojka) sold the jet . . . You have a moment to discuss?" *Id.* at 3–4. Due to scheduling conflicts, counsel for the parties were not able to speak until November 12, 2025. In the interim, however, on November 11, 2025, Brian Naujelis, the President of Petitioner Naujelis, reached out directly to Mr. Sojka by text, despite (i) Petitioners having already filed this Petition on October 27, and (ii) Petitioners' counsel having been in contact with Madwell's undersigned counsel. Harwood Decl., Ex. 10. In the exchange, Mr. Naujelis unambiguously sought to induce a payment from Mr. Sojka in exchange for dismissing the Petition. In the first message, Mr. Naujelis wrote to Mr. Sojka, referencing the purported sale of the above-referenced plane: "The jet has been sold. ***When should I expect payment?***" *Id.* (emphasis added). Mr. Sojka responded: "You do realize you are currently participating in a motion to force Chapter 7 liquidation of Madwell, yes?" *Id.* Mr. Naujelis replied: "***It could go away if we were to get paid what we're rightfully owed.***" *Id.* (emphasis added). Mr. Sojka responded: "We should talk. I mean truthfully. If you are texting me then we might as well talk. Not as a negotiation, but as humans." *Id.* Mr. Sojka later followed

up, "Brian, in all seriousness, would you be willing to get on the phone?" *Id.* Mr. Naujelis did not respond further, and the exchange ended. *Id.*

When Petitioners' counsel and undersigned counsel spoke the following day, November 12, 2025, undersigned counsel was not yet aware of the above text exchange, and started the call by requesting an extension of time to respond to the Petition. Harwood Decl. at ¶ 7. Undersigned counsel also addressed Petitioners' counsel's statement in his email that prompted the call — *i.e.*, Petitioners' counsel's statement, "I gather your client (Sojka) sold the jet?" — conveying that it had not yet sold. *Id.* After counsel had a back-and-forth regarding the extension request, Petitioners' counsel stated that one of the reasons he requested the call was to discuss that (i) the bankruptcy proceeding was in the gap period where it could be dismissed, (ii) Petitioners could not at that point seek, and were not seeking, payment from Madwell directly, but (iii) a third party could pay to get Madwell out of bankruptcy. *Id.* After undersigned counsel did not engage in response to what he interpreted as a clear suggestion that Mr. Sojka could pay Petitioners to obtain a dismissal of the Petition, and Petitioners' counsel confirmed Petitioners' refusal to consent to an extension of Madwell's deadline to respond to the Petition, the call ended. *Id.*

On November 19, 2025, Madwell filed a motion to extend the time for it to respond to the Petition until December 19, 2025 [Dkt. 6], which the Court granted at a hearing on December 17, 2025 [Dkt. 22].

**D. The Petition Includes Non-Qualifying Debts**

Setting aside that the communications from Petitioners and their counsel reflect that the Petition was threatened and then filed to try to extract a payment from Mr. Sojka to avoid or dismiss this bankruptcy, two Petitioners quite clearly are not proper creditors of Madwell. The claims of Petitioners Freelunch and KIV are based on alleged debts that were incurred not by Madwell but by another entity, Maple Syrup and Jam LLC d/b/a Starfish ("Starfish"). Starfish is

an affiliate of Madwell, but is a separate and legally distinct entity — as reflected by Starfish's Certificate of Authority issued by the New York State Department of Taxation and Finance to Starfish. *See* Delgado Decl., Ex. 1.

With respect to Petitioner Freelunch, Madwell has identified two invoices from Freelunch to "Starfish Projects" for, collectively, $12,649.10. *See* Delgado Decl. Exs. 2, 3. Similarly, with respect to Petitioner KIV, Madwell has identified four invoices from KIV to "Starfish Projects," with two of them being for $42,500.00, another for $3,000.00, and the other for $7,000.00. *See* Delgado Decl., Exs. 4–7. Madwell has not identified any invoices from either of those Petitioners to Madwell. Notably, the cited invoices are for amounts greater than these Petitioners' respective claims, thus reflecting that Petitioners' claims relate entirely to alleged debts of Starfish rather than Madwell. [*See* Dkt. 1 (reflecting claims for Freelunch and KIV for $10,149.10 and $50,000.00, respectively).]

**E. Joinder of New Petitioners**

On December 17, 2025, mere hours after the Court granted Madwell's motion to extend its deadline to respond to the Petition to December 19, 2025, Petitioners' counsel filed three statements of joinder requesting that three new alleged creditors — DMB USA LLC, Knock It Out Records LLC, and XNC Incorporated — be joined as petitioning creditors pursuant to Section 303(c) of the Bankruptcy Code. [Dkt. 19, 20, 21.] As discussed below, *infra* at 19, the joinder of these new Petitioners cannot cure the defects in the Petition and does not undermine any of the arguments for dismissal made herein. Given the timing of these filings (which suggests that they were held in reserve until after the Court's December 17, 2025 hearing), Madwell objects to the joinder of these new alleged creditors and reserves the right to supplement its papers to address any deficiencies in their alleged claims that its investigation of the claims may uncover.

## LEGAL STANDARD

Section 303 of the Bankruptcy Code, which governs involuntary bankruptcy proceedings under Chapter 7, contains three requirements for filing a Chapter 7 petition: (i) there must be three or more petitioning creditors; (ii) each petitioning creditor must hold a claim against the debtor that is not contingent as to liability or the subject of a bona fide dispute; and (iii) the claims must aggregate at least $21,050 more than the value of any lien on the property of the debtor securing such claims held by the holders of such claims. 11 U.S.C. § 303(b)(1). But even where the statutory criteria are met, a Chapter 7 petition nevertheless may be subject to dismissal. For example, Section 305(a)(1) of the Bankruptcy Code permits a bankruptcy court to dismiss any bankruptcy case when, as here (given undersigned counsel's ongoing Investigation), "the interests of creditors and the debtor would be better served by such dismissal . . . ." 11 U.S.C. § 305(a)(1).

Courts also may dismiss Chapter 7 petitions where a court finds that the petition was filed in bad faith. *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).[4] Bankruptcy courts, as courts of equity, must enforce "'good faith' filing requirements," *id.* at 334, especially in the context of involuntary petitions, which are "extreme remed[ies] with serious consequences to the alleged debtor," *id.* at 335 (quoting *In re Reid,* 773 F.2d 945, 946 (7th Cir. 1985)). Although the Second Circuit has not endorsed a particular test for a finding of bad faith in the bankruptcy context, *see In re Bayshore Wire Products Corp.*, 209 F.3d 100, 105–06 (2d Cir. 2000), most courts within the Second Circuit apply the "totality of the circumstances" standard to determine whether an involuntary petition was filed in bad faith, *see In re CNG Foods LLC*, 2020

[4] Bad faith dismissals arise out of language in 11 U.S.C. § 303(i)(2) providing that if the court dismisses an involuntary petition, it may award damages against any creditor "that filed the petition in bath faith."

WL 4219679, at *11 (Bankr. E.D.N.Y. July 13, 2020) (collecting cases). In conducting this fact-intensive review, courts consider a number of factors, including, but not limited to, whether:

> the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*In re Forever Green*, 804 F.3d at 336; *CNG Foods*, 2020 WL 4219679, at *11.

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) is instructive. There, alleged debtor Forever Green had "essentially shut down its business," and its largest remaining asset was a $5 million claim for diversion of corporate assets against an entity owned by the Chapter 7 creditors, which claim was in pending arbitration. *Id*. at 331–32. The Chapter 7 creditors had obtained a $300,000 judgment against Forever Green in a separate action and, two weeks before their brief was due in the arbitration, the creditors filed an involuntary bankruptcy petition against Forever Green. *Id*. at 331. The bankruptcy court dismissed the petition for bad faith, and its decision was upheld on appeal by the district court and the Third Circuit. *Id*. at 330, 332.

In affirming, the Third Circuit explained that the involuntary petition "ran counter to the spirit of collective creditor action that should animate an involuntary filing" and that the Chapter 7 creditors put their "own interests above all others" by using the involuntary petition to try to end the pending arbitration. *Id*. at 336–37. The Court further explained that, "[b]y trying to end the arbitration," the Chapter 7 creditors were (i) "obstructing Forever Green from pursuing its largest asset, the potential proceeds of which Forever Green could have used to pay its creditors" and (ii) "using the bankruptcy process to exert pressure on Forever Green to pay the consent judgment

without regard to Forever Green's other creditors, many of which had higher priority claims." *Id.* at 336. The Third Circuit confirmed that such conduct provides a sufficient basis for dismissing an involuntary petition even where the statutory criteria for commencing an involuntary proceeding are satisfied. *Id.* at 333–34

Bankruptcy courts also are authorized by 11 U.S.C. § 707(a) to dismiss an involuntary Chapter 7 petition for cause, with the determination of whether cause exists left to the discretion of the court. Similar to the standard under Section 305(a)(1), under Section 707(a), courts determine whether cause exists by "looking at whether dismissal would be in the best interest of all parties." *In re Murray*, 900 F.3d 53, 58 (2d Cir. 2018) (quoting *In re Smith*, 507 F.3d 64, 72 (2d Cir. 2007)). Even if the statutory requirements are met and ***absent a finding of bad faith***, a court may dismiss a Chapter 7 petition under Section 707(a) if it determines that the petition constitutes an "[i]nappropriate use of the Bankruptcy Code." *See id.* at 60–61. In *In re Murray*, the petitioning creditor sought to use a Chapter 7 petition for the sole purpose of enforcing a $19 million arbitration award against the alleged debtor, who had no income and whose only asset was a residential apartment that he co-owned with his wife and on which the creditor had secured a lien, by "tak[ing] advantage of bankruptcy remedies that would allow [the creditor] to force a sale of the apartment—notwithstanding [debtor's] wife's interest." *Id.* at 57. Following discovery, the bankruptcy court *sua sponte* dismissed the petition for cause under Section 707(a) as an improper exploitation of the bankruptcy system. *Id.* The district court and the Second Circuit affirmed. *Id.* at 56. In its opinion, the Second Circuit explained that "dismissal better advances Murray's interests as a debtor, furthers the interests of the bankruptcy courts and the public, and does not substantially prejudice [the Chapter 7 creditor's] interests as a creditor." *Id.* at 59.

The standards set forth above intertwine — "courts that consider bad faith to be cause to dismiss often classify such inappropriate use as evidence of bad faith," *see id.* at 60 (citing *In re Forever Green*, 804 F.3d at 336) — and boil down to the same fundamental questions: whether the petition constitutes an inappropriate use of the Bankruptcy Code, and whether the interests of the parties are better served by dismissal.

## **ARGUMENT**

The Petition should be dismissed because (i) the evidence submitted herewith confirms that it was filed in bad faith and for an improper purpose and (ii) the interests of the Company and its creditors would be better served by dismissal — which would permit undersigned counsel to continue the Investigation into the seeming fraud committed against Madwell and, if appropriate based on the results of the Investigation, to pursue claims against any culpable parties for the ultimate benefit of all creditors. Consistent with its prior offer to Petitioners, while Madwell's Investigation continues, Madwell is willing to be fully transparent with Petitioners, including with respect to its assets (past and present). Madwell simply does not want a Chapter 7 proceeding that was filed for an improper purpose to delay or otherwise interfere with the Investigation. The Investigation is being conducted by counsel with substantial experience in investigating sophisticated financial frauds, and the prospect of an unknown trustee with unknown experience taking over the Investigation at best would result in unnecessary delay (a significant consideration when an investigation involves potential fraud by third parties) and at worst would result in an insufficient investigation that, assuming viable claims exist, fails to identify them and/or identify and piece together the evidence to pursue them successfully.

With respect to the Petition's improper purpose, what Petitioners have done here is analogous to what the creditors did in *In re Forever Green* and *In re Murray*: Petitioners first used the threat of filing the Petition to try either to (i) extract a payment from Mr. Sojka in his personal

capacity for alleged debts of Madwell or (ii) jump the line of creditors, including BOA. When that failed, they then used the filing of the Petition coupled with the prospect of its voluntary dismissal to try to obtain the same improper benefit. That the Petition was designed for an improper purpose is further confirmed by its facial defects — that two of the Petitioners, Freelunch and KIV, are creditors of Starfish rather than Madwell, which even a minimal investigation would have revealed. Given that obvious facial defect, Petitioners cannot plausibly claim to have conducted an adequate pre-Petition investigation of their supposed claims. That concern presumably is what led Petitioners' counsel to file joinders by three additional supposed creditors two days before the deadline for this filing. [*See* Dkt. 19–21]. The joinders, however, do not cure the defects in the Petition caused by it being brought in bad faith and/or for an improper purpose. *See Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 789 (E.D. Pa. 2014) (affirming bankruptcy court's dismissal of involuntary petition for bad faith and "[a]dopting the majority rule that bad faith bars joinder of other petitioning creditors") (*aff'd sub. nom. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015)).[5]

Moreover, dismissal would favor creditors of Madwell as a whole, as it would avoid a small set of self-interested creditors from (i) forcing Madwell into bankruptcy as part of a failed gambit to use Chapter 7 to obtain an improper pre- or post-Petition benefit for themselves, and

[5] *See also In re Centennial Ins. Associates, Inc.*, 119 B.R. 543, 546–47 (Bankr. W.D. Mich. 1990) (prohibiting joinder of additional creditor to cure involuntary bankruptcy petition where one of three initial petitioners joined petition in bad faith because "the intervention of a subsequent good faith creditor does not remove the taint of an original bad faith petitioning creditor"); *Basin Elec. Power Co-op. v. Midwest Processing Co.*, 769 F.2d 483, 486–87 (8th Cir. 1985) (if initial petition is tainted by bad faith, joiner of additional creditors must be denied); 3 Hon. Joan N. Feeney & Michael J. Stepan, *Bankruptcy Law Manual* § 14:13 (5th ed., Dec. 2025 Update) (observing that "[t]he majority of bankruptcy courts have adopted this approach").

thereby (ii) disrupting undersigned counsel's advanced Investigation that is being conducted for the potential benefit of all creditors.

Finally, given the evidence Madwell has uncovered to date regarding (i) the improper purpose of this Chapter 7 proceeding, (ii) the dispositive defects in multiple Petitioners' claims, and (iii) the seemingly significant red flags of potential fraud, while the motion to dismiss is pending, Madwell should be permitted to take discovery of Petitioners and relevant third parties regarding the above matters, including, without limitation, their alleged claims.

## I. The Court Should Dismiss the Petition Because It Was Filed in Bad Faith and/or Constitutes an Abuse of the Bankruptcy Code.

Even if Petitioners ultimately can demonstrate that at least three of them satisfy the statutory requirements to obtain relief through Chapter 7 bankruptcy (as noted, discovery is warranted to further evaluate that issue), the Petition should nonetheless be dismissed because multiple factors weigh in favor of a finding that the Petition was filed in bad faith and for an improper purpose.

First, communications from Petitioners and their counsel show that the Petition was filed "to obtain a disproportionate advantage for [Petitioners] rather than to protect against other creditors doing the same," and that Petitioners used the threat of a Chapter 7 proceeding "as a substitute for customary debt-collection procedures." *In re Forever Green*, 804 F.3d at 336. Both Petitioners and their counsel have made clear that they intended from the outset to use the Petition as a means either (i) to coerce a payment from Mr. Sojka individually for debts allegedly owed by Madwell (for which he has no personal liability) or (ii) to jump the line of creditors — either of which constitutes an improper purpose.

Knowing that BOA was poised to obtain a more than $4 million judgment against Madwell, Petitioners' counsel contacted Madwell's counsel on October 8, 2025 threatening to file a Chapter

7 petition absent an immediate agreement to pay Petitioners $563,859.10 that Madwell allegedly owed to them. After undersigned counsel explained to Petitioners' counsel on October 15, 2025 that Madwell lacked the ability to pay Petitioners what they were demanding, requested that Petitioners hold off on filing the threatened Petition to enable counsel to complete the Investigation he was conducting for the potential benefit of all creditors, and offered to provide Petitioners full disclosure of Madwell's finances in the meantime, Petitioners' counsel stated on October 16 that he did not "see much point in having a further [dialogue]" if ***"there is no offer on the table for our group [i.e., Petitioners] — either cash, or some kind of accelerated interest in a third party asset."*** Harwood Decl., Ex. 9 at 11 (emphasis added). Later that day, Petitioners' counsel reiterated the point even more bluntly, writing: ***"Money talks. Your client has assets."*** *Id*. at 9 (emphasis added).

Regardless of whether Petitioners were seeking to extract a payment from Mr. Sojka individually (as it appears) or to jump the line of Madwell creditors (as also may have been the case), Petitioners' counsel's statements render the Petition objectionable: either Petitioners were seeking to coerce Mr. Sojka to pay them using his personal assets notwithstanding his lack of personal liability for any alleged debts of Madwell (in which case Petitioners were using the threat of bankruptcy as an improper "substitute for customary debt-collection procedures," *In re Forever Green*, 804 F.3d at 336) or they were seeking to coerce Mr. Sojka to pay them using supposed Madwell assets (in which case they tried "to obtain a disproportionate advantage for themselves" to the detriment of other creditors, including BOA, "rather than to protect against other creditors doing the same," *id.*). Either way, Petitioners used the threat of an involuntary bankruptcy to try to obtain assets to which they are not entitled.

When Petitioners' pre-Petition threats did not work, Petitioners filed the Petition and engaged in a further misuse of the bankruptcy process: they sought to use the filing of the Petition — coupled with the prospect of its dismissal if Mr. Sojka were to pay them using his personal assets — as a further means to extract an improper payment from Mr. Sojka. Specifically, on November 10, 2025, after the Petition had been filed and Madwell's counsel had previously conveyed his understanding that the airplane was not a Madwell asset, Petitioners' counsel emailed Madwell's counsel asking to discuss the purported sale of the airplane, writing "I gather your client (Sojka) sold the jet . . . You have a moment to discuss?" The very next day, the principal of Petitioner Naujelis sent his unsolicited (and unauthorized) text messages to Mr. Sojka offering a *quid pro quo*: a payment by Mr. Sojka to Petitioners from the proceeds of the sale of the airplane in exchange for the dismissal of the Petition. Petitioner Naujelis's texts are unambiguous on this point, with him writing: ***"The jet has been sold. When should I expect payment?"*** and ***"It [i.e., this Chapter 7 proceeding] could go away if we [i.e., Petitioners] were to get paid what we're rightfully owed."*** Harwood Decl., Ex. 10 (emphasis added). The next day — when Petitioners' counsel and Madwell's counsel connected after Petitioners' counsel's November 10 email — Petitioners' counsel reiterated the same message. *See* Harwood Decl. at ¶ 7. He explained that he wanted to discuss that (i) this proceeding was in the gap period where it could still be dismissed, and (ii) although Petitioners could not seek (and were not seeking) a payment from Madwell directly, a third party (*i.e.*, Mr. Sojka) could pay to get Madwell out of bankruptcy. *Id.*

The above communications demonstrate unambiguously Petitioners' intent to use first the threat of filing the Petition, and then the actual filing of the Petition, either to (i) obtain payment from Mr. Sojka in his personal capacity for debts allegedly incurred by Madwell (for which Mr. Sojka has no personal liability), or (ii) sidestep legitimate creditors with higher priority claims.

The communications thus reflect bad faith and/or an improper use of these bankruptcy proceedings. The communications confirm that Petitioners used the Petition to "obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same" and as "a substitute for customary debt-collection procedures." *In re Forever Green*, 804 F.3d at 336.

That the Petition was brought in bad faith and/or for an improper purpose also is supported by the Petition's "suspicious timing." *Id.* Despite Madwell having ceased all business operations in April 2025, Petitioners curiously sent their demand letter threatening to file this proceeding approximately six months later, on October 8, 2025 — knowing that the $4.1 million BOA Judgment was poised to be entered against Madwell (it ended up being entered two days later on October 10). Petitioners then continued to seek both pre- and post-Petition payments from Mr. Sojka after the BOA Judgment was entered. The timing of both Petitioners' threat to file the Petition and the filing of the Petition itself thus suggest that Petitioners intended to use both as a tactical maneuver to extract a payment from Mr. Sojka for the benefit of themselves rather than to protect the claims of all creditors.

Finally, the inclusion in the Petition of debts that were incurred by Starfish, not Madwell, further supports a finding of bad faith/improper use, as it shows that Petitioners did not conduct "a reasonable inquiry into the relevant facts and pertinent law before filing." *In re Forever Green*, 804 F.3d at 336. Even a minimal amount of due diligence would have revealed that two Petitioners are creditors of Starfish, not Madwell. Petitioners' prior response to this point in opposing Madwell's motion to extend its time to file its response to the Petition — that even if the two Petitioners' alleged claims are based on debts owed by Starfish instead of Madwell, Madwell was nonetheless the "payor on prior payments" and "acknowledged the amounts owed in writing" [Dkt.

9 at 3 n.1] — confirms that Petitioners did not conduct a reasonable inquiry. Even if what Petitioners say is true, at most it could be used to argue that Madwell should be deemed an alter ego of Starfish and Madwell would dispute such an argument, meaning that any claims premised on alter ego liability would be subject to a bona fide dispute, disqualifying such claims for purposes of a Chapter 7 petition.

## II. The Court Should Dismiss the Petition Because the Interests of Legitimate Creditors and the Alleged Debtor Would Be Better Served by Dismissal.

Even setting aside the evidence supporting a finding of bad faith/improper use, dismissal of the Petition also is warranted under Section 305(a)(1) of the Bankruptcy Code, because "the interests of creditors and the debtor would be better served by such dismissal . . . ." 11 U.S.C. § 305(a)(1). As previously discussed, undersigned counsel's Investigation has uncovered significant evidence indicating that Madwell may have been the victim of a multi-year fraud, including that (i) inflows to its bank account exceed the total revenue reported on Madwell's third-party prepared tax returns by approximately ***$187 million*** for the period 2018–23, and (ii) the Private Records reflect significantly higher revenue than what is reflected in the Company's third-party prepared tax returns and P&L statements. Delgado Decl. at ¶¶ 15–17. The Investigation also has uncovered evidence regarding how money may have been diverted out of Madwell. *Id.* at ¶ 18.

Madwell's creditors thus are benefiting from an Investigation that is being conducted by a former AUSA with substantial experience investigating and successfully pursuing claims in connection with complex fraud schemes. Further, if the Investigation were to lead to recoveries, such recoveries would not be used to offset the Investigation's costs unless and until Madwell's creditors have been fully repaid. The creditor class thus will benefit if undersigned counsel is allowed to continue the Investigation — and build on the several months of work which already have uncovered significant evidence of what appears to be a fraudulent diversion of millions of

dollars out of Madwell — rather than risking the derailing of the Investigation, adding cost ahead of legitimate creditors, and risking that what could potentially be a massive fraud is never properly vetted and, if appropriate, addressed. Even if a Chapter 7 trustee ultimately is appointed, and such individual has the knowledge and experience to conduct a similarly effective investigation, the Investigation may well not get the same attention, including because these are not issues that are likely to convert to cash quickly (if at all). Moreover, any actions by a trustee will necessarily take a significant cut of any recovery off the top, thereby decreasing the total recovery available for creditors.

Moreover, any concerns Petitioners may have regarding Mr. Sojka (while unwarranted) can be alleviated by Petitioners accepting Madwell's continuing offer to provide them with full transparency regarding Madwell's historical and current activities. Such transparency can extend to matters pertaining to the Investigation — so long as appropriate procedures are put in place to ensure that such transparency does not risk undermining the Investigation or potential claims.

## III. Madwell Should Be Permitted to Seek Discovery.

While Madwell's opposition to and motion to dismiss the Petition are pending, based on the evidence discussed herein, Madwell should be permitted to seek discovery (i) from Petitioners regarding the purpose of this Chapter 7 proceeding and whether their alleged claims meet the statutory requirements for bringing a Chapter 7 proceeding, and (ii) third parties with information potentially relevant to the Investigation. Madwell has presented evidence that (i) the purpose of the Petition was to extract an improper payment from Mr. Sojka (*see supra* at 20–23), (ii) two Petitioners are not creditors of Madwell and thus do not have qualifying debts, (iii) another Petitioner appears potentially to have received a double payment of $356,250, which if it did, also would eliminate this Petitioner from having a qualifying debt, and (iv) discovery in furtherance of Madwell's ongoing Investigation is warranted.

Given the foregoing, good cause exists to allow Madwell to pursue discovery at this juncture on the foregoing topics. That two Petitioners have asserted facially deficient claims and at least one more may have asserted a deficient claim warrants discovery to fully evaluate their and the other Petitioners' claims (including the alleged creditors for which notices of joinder were filed two days ago), and allow a full evaluation of the Petition. The proposed discovery also would benefit all creditors by enabling discovery in furtherance of the Investigation. Consistent with its prior offer of full transparency, Madwell would be willing to provide discovery to Petitioners on appropriate topics.

## CONCLUSION

For the foregoing reasons, the Court should grant Madwell's opposition to and motion to dismiss the Petition, and permit the parties to engage in interim discovery.

Dated: December 19, 2025
New York, New York

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

/s/ Christopher B. Harwood
Christopher B. Harwood
565 Fifth Avenue
New York, New York 10017
Tel: (212) 880-9547
Fax: (212) 856-9494
charwood@maglaw.com

*Counsel to Madwell LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2025, a true and correct copy of the foregoing Memorandum of Law in Support of Alleged Debtor's Opposition to Involuntary Chapter 7 Petition, Motion to Dismiss, and Request for Discovery has been served on all counsel of record via electronic filing with the Clerk of Court using the CM/ECF system.

Dated: December 19, 2025
New York, NY

/s/ Christopher B. Harwood

Christopher B. Harwood
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
Tel: 212-880-9547
Fax: 212-856-9494
charwood@maglaw.com

*Counsel for Madwell LLC*