**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

In Re:

MADWELL LLC

Alleged Debtor.

Case No: 1−25−45169−ess

Involuntary Chapter 7

# **PETITIONING CREDITORS' OPPOSITION TO MOTION TO DISMISS INVOLUNTARY CHAPTER 7 PETITION**

SARACHEK LAW FIRM
670 White Plains Road, #PH
Scarsdale, New York 10583
Tel: (646) 517-5420

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

RELEVANT FACTS .......... 4

A. Mismanagement, Insider Fraud, Usurpation of Corporate Opportunities and Looting Lead's to Madwell's Insolvency .......... 5

B. Madwell is Generally Not Paying its Obligations, Including those Owed to the Original and Joining Petitioners .......... 9

C. Madwell's Sojka Tries to Deflect Blame to his Former Partner Eisenman, and Pretends to Hire an Outside Forensic Accounting Firm (That Does Not Exist) .......... 12

ARGUMENT .......... 13

A. The Petition was Proper, and Madwell is a Proper Involuntary Debtor .......... 13

B. There are no 'Bona Fide' Disputes as to Any of the Petitioner's Claims, and the Motion Raises No Disputes Whatsoever as to Seven of the Petitioners' Claims .......... 16

C. The Debtor Has Not Demonstrated Any Bad Faith in the Petitioners' Decision to File the Petition .......... 20

D. Abstention under Section 305(a)(1) of the Bankruptcy Code is Not in the Interests of Creditors or the Debtor .......... 23

E. The Debtor Fails to Explain a Plausible Need for Discovery on the Motion to Dismiss .......... 25

CONCLUSION .......... 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006).................... 22
*Basin Elec. Power Co-op. v. Midwest Processing Co*, 769 F.2d 483 (8th Cir. 1985)............ 20, 21
*CNG Foods*, 2020 WL 4219679 (Bankr. E.D.N.Y. July 13, 2020)............................................. 23
*Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC),* 793 F.3d 228 (2d Cir. 2015)............. 14
*In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718 (Bankr.N.D.Ill.1996).................... 26
*In re Amanat*, 321 B.R. 30 (Bankr.S.D.N.Y.2005)..................................................................... 16
*In re Aminian*, No. 07-12957 (AJG), 2008 WL 793574 (Bankr. S.D.N.Y. Mar. 25, 2008)......... 14
*In re B.D. Int'l Discount Corp.*, 701 F.2d 1071 (2d Cir.1983) .................................................... 17
*In re David Amrusi,* Case No. 23-44588-ess, *Memorandum Decision*, ECF 44, (Bankr. E.D.N.Y. Sept. 30, 2025)........................................................................................................... 17, 18
*In re Eastman*, 188 B.R. 621 (9th Cir. BAP 1995)...................................................................... 26
*In re Euro–American Lodging Corp.*, 357 B.R. 700 (Bankr.S.D.N.Y.2007).............................. 16
*In re Fischer*, 202 B.R. 341 (E.D.N.Y. 1996)............................................................................... 16
*In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. 906 (Bankr. D. Del. 2010)...................... 21
*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015) ..................................... 21
*In re Kidwell*, 158 B.R. 203 (Bankr. E.D. Cal. 1993).................................................................. 21
*In re Monitor Single Lift I, Ltd.*, 381 B.R. 455 (Bankr. S.D.N.Y. 2008)..................................... 25
*In re Murray*, 900 F.3d 53 (2d Cir. 2018)..................................................................................... 23
*In re Paper I Partners, L.P.*, 283 B.R. 661 (Bankr. S.D.N.Y.2002) ..................................... 16, 26
*In re Simon Taub*, Case No. 10-4155, *Decision*, ECF 12, (Bankr. E.D.N.Y. Sept. 7, 2010) ....... 17
*In re Trina Assoc.*, 128 B.R. 858 (Bankr.E.D.N.Y.1991)............................................................ 26
*In re Zarnel*, 619 F.3d 156 (2d Cir. 2010) ..................................................................................... 21
*Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111 (2d Cir. 2003).................... 18

**Rules**

11 U.S.C. § 303(b) ............................................................................................................... 14, 22
11 U.S.C. § 303(b)(1) ........................................................................................................ 2, 13, 14
11 U.S.C. § 303(c) ........................................................................................................................ 19
11 U.S.C. § 303(h) ........................................................................................................... 14, 15, 16
11 U.S.C. § 303(h)(2) .................................................................................................................. 2, 22
11 U.S.C. § 303(j) ............................................................................................................................. 3
11 U.S.C. § 305(a)(1)................................................................................................................. 4, 24
11 U.S.C. 303(h)(1) ......................................................................................................... 2, 14, 16, 22

Petitioners Laundry Design LLC ("Laundry"), Freelunch Forever LLC ("Freelunch"), Kruh in Vino, Storitvene Dejavnosti, D.O.O. ("KIV"), Hiteny S.A. ("Hiteny"), Coupe Studious Music & Sound Design, LLC ("Coupe"), Naujelis Enterprises Inc. ("Naujelis"), along with joining petitioners DMB USA LLC ("DMB"), Knock it Out Records LLC ("Knock it Out"), XNC Incorporated ("XND") and Lagland LLC ("Lagland," and collectively, the "Petitioners"), by and through their undersigned counsel, respectfully submit this opposition (the "Opposition") to the alleged debtor Madwell LLC's (the "Debtor" or "Madwell") *Opposition to Involuntary Chapter 7 Petition, Motion to Dismiss, and Request for Discovery* (the "Motion", ECF 23). The Opposition is supported by the accompanying affirmations of each of the original six Petitioners[1] (the "Petitioner Affs."), the respective declarations in joinder of petitioners DMB, Knock it Out, XNC and Lagland (the "Joinder Decls.", ECF 19-1, 20-1, 21-1 and 28-1) as well as the Affirmation of counsel Zachary E. Mazur (the "Mazur Aff.). Petitioners respectfully state as follows:

**PRELIMINARY STATEMENT**

Petitioners[2] filed the instant petition on October 27, 2025 (the "Petition," ECF 1), after weeks of unsuccessful settlement discussions with opposing counsel. The Original Petitioners initiated these proceedings because Madwell is a clear case of a debtor that should be in a Chapter 7 liquidation, overseen by a competent Chapter 7 Trustee under the supervision of this Court and the U.S. Trustee. This is a textbook case for an involuntary bankruptcy, where creditors like the Petitioners have serious concerns about fraud and preferential payments that have already significantly diminished Madwell's ability to pay the debts owed. Madwell's Motion only reinforces the Petitioners' suspicions that Madwell's insider and director Christopher Sojka

[1] Each of the Petitioner affirmations, individually, will be referred to herein using the designation "[Petitioner name] Aff."

[2] The original sixed petitioners were comprised of Laundry, Freelunch, KIV, Hiteny, Coupe and Naujelis (the "Original Petitioners", the remaining Petitioners being the "Joining Petitioners").

("Sojka") has been looting the company for years, to the tune millions of dollars. Those suspicions are further buttressed by materials sourced from a state court litigation that took place between Sojka and his ex-partner David Eisenman. The notion that Sojka's own attorneys would investigate their client's role in the fraud at Madwell is inadequate for obvious reasons.

Each of the ten Petitioner's claims are "not contingent as to liability or the subject of a bona fide dispute as to liability or amount," as per section 303(b)(1) of the Bankruptcy Code. The claims were thoroughly vetted prior to filing the Petition. Not only are the claims evidenced by invoices, but in each case texts or emails from Madwell, some from Sojka himself, acknowledge the debt (sometimes even the exact amount). Meanwhile, Madwell has presented no evidence that any defense was raised in response to the many demands for payment before the bankruptcy filing. Even if some of the ten Petitioner claims are subject to a bona fide dispute (they are not), there are three or more claims that Madwell has not even purported to dispute, easily achieving the statutory minimum as per Bankruptcy Code § 303(b)(1). The Motion raises only flimsy red herrings.

The other statutory elements are all evident in the instant case. Madwell is "generally not paying such debtor's debts as such debts become due," as per § 303(h)(1), as the Debtor admits in the Motion. Also, following a judgment entered against Madwell by Bank of America on October 10, 2025 (the "<u>BoA Turnover Judgment</u>," attached to the Mazur Aff. as Ex. 1), it can be said that "within 120 days before the date of the filing of the petition, a custodian…was appointed or took possession" over all of Madwell's assets. Bankruptcy Code § 303(h)(2).

The allegations that the Petitioners acted in bad faith, either pre- or post-petition, are incoherent. There is no way that the instant bankruptcy filing can benefit the Petitioners over other creditors. Before filing the Petition, some of the Petitioners demanded payment and threatened the bankruptcy filing. A copy of the Petitioners' October 8, 2025 demand letter is attached to the

Harwood Declaration as Exhibit 8. (the "Demand Letter," ECF 25-1). Demand payment is what creditors have done since the beginning of time. In fact, it might have been in bad faith to have filed the Petition *without* first demanding payment. Madwell, or any interested third party, including Sojka or even secured creditor Bank of America, could have paid the Petitioners' claims to avoid this bankruptcy. Sojka could have used some of the money that he extracted from the Debtor to make those payments. Tellingly, in response to the Demand Letter, the Debtor did not assert any dispute, bona fide or otherwise, as to the Petitioner's claims or the claim amounts. All of the purported disputes were concocted for the sole purpose of opposing the Petition.

The Motion fixates on a frustrated text message sent post-petition by one of the Petitioners, Naujelis, to Sojka. ECF 25-3 ("When can I expect payment?"). In that text chain, Mr. Naujelis was venting his frustration that Sojka opted to use corporate funds to buy a private jet for over $17 million rather than pay Madwell's creditors. To whatever extent the conversation could be construed as a negotiation, the text messages, which were directed to a non-debtor, do not even rise to the level of a stay violation. Further, neither Naujelis nor Sojka seems to understand bankruptcy procedure: there was no "motion" filed at that time, and the Petition cannot be dismissed except on notice to all of Madwell's creditors, and after a hearing. *See* Bankruptcy Code § 303(j). As discussed *infra,* Sojka had previously sent Naujelis a report from a fictitious forensic accounting firm which he claimed to have hired to investigate massive fraud at Madwell, and Mr. Naujelis was reacting to the use of corporate funds to purchase a private jet rather than address and remediate the fraud about which Mr. Sojka claimed to be concerned.

Ironically, it is the *Motion* that was filed in bad faith, not the Petition. Through the Motion, Sojka, purporting to act through the Debtor, is effectively trying to prevent Madwell's creditors from investigating the insider fraud. Sojka wants his own personal attorney to investigate his

fraudulent conveyances and his use of corporate funds for personal expenses, rather than an independent fiduciary. He will go to any lengths to keep a Chapter 7 Trustee far from Madwell.

Distressingly, the Motion contains omissions and carefully crafted affirmations that could mislead the Court. For example, the Motion declares that Madwell's software "appears to reflect" duplicate payments to petitioner Laundry. Motion at 9. But it is trivial to determine that Madwell did not, in fact, make duplicate payments to Laundry and so inform the Court. A five-minute "investigation" into Madwell's bank records would have cleared up that fake "dispute." Surely Madwell's CFO Robert Delgado[3] could have cleared this up in his declaration. The Motion also claims that the $17.5 private jet that Sojka purchased "were neither a source of liquidity to Mr. Sojka personally nor characterizable as assets of Madwell." Motion at 11-12. This characterization fails to mention that Sojka used Madwell's corporate funds, and likely diverted client payments, to purchase the jet, and that, in litigation in New York County Supreme Court, the Debtor attempted to justify the purchase as a proper business expenditure of Madwell.

The notion that "the interests of creditors and the debtor would be better served by… dismissal…" is fanciful. 11 U.S.C. § 305(a)(1). Motion at 12. There is no other proposed mechanism for the liquidation of the Debtor – no state court windup proceedings, no receivership, no assignment for the benefit of creditors, no Article 9 sale. The alternative posed in the Motion is that Sojka/Debtor's own attorneys will handle a self-serving investigation into their own clients' fraud. The Petitioners reject that proposition for obvious reasons.

## RELEVANT FACTS

Madwell, which previously operated as a Brooklyn-based independent ad agency, was co-founded in 2010 by Sojka and his partner David Eisenman ("Eisenman"). From that time, Madwell

[3] According to his declaration, Mr. Delgado was CFO of Madwell for a matter of weeks. ECF 24 ¶ 2.

grew to over 100 employees, with tens of millions of dollars in annual revenue. The company collapsed into insolvency from late 2024 to early 2025. Motion at 5. Madwell ceased operations on April 30, 2025. Since April 30, the Company has not engaged in any business activities. *Id.*

### *A. Mismanagement, Insider Fraud, Usurpation of Corporate Opportunities and Looting Lead's to Madwell's Insolvency*

According to a complaint filed by Sojka against Eisenman on April 22, 2024, starting in 2020 the two partners had increasingly disagreed about Madwell's business strategy. *Sojka v. Eisenman*, Sup. Ct. New York County, Index No. 511438/2024, *Complaint* (the "Sojka Complaint"[4] in the "*Sojka v. Eisenman* Litigation"). In that Complaint, Sojka accuses Eisenman of running a "campaign to deprive and/or drain Sojka and Madwell of funds and resources and/or misappropriate Madwell funds and resources for his own personal use." Sojka Complaint at 18. Eisenman filed his answer to the Sojka Complaint with counterclaims (the "Eisenman Counterclaim"), accusing Sojka of looting the company.

Sojka had initiated the *Sojka v. Eisenman* Litigation after Eisenman attempted to have Madwell engage an outside forensic accountant to investigate its financial dealings, including suspicious transactions by Sojka and Sojka's attempt to purchase a private jet. The litigation seems like it was designed by Sojka as a smokescreen to divert attention from his own corporate malfeasance. Over the course of the litigation, Eisenman's counterclaim details Sojka's use of the Debtor's corporate funds for his personal use in a sworn affirmation, including:

i. $8,876.40 at James Perse (an upscale clothing boutique) on June 24, 2023;

ii. $1,648.24 at Kensington Luggage in Santa Monica, California for "LEATHER GOODS" on October 26, 2023;

[4] A full copy of the Sojka Complaint is available online at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=JDHM2Byq8v02Qd4q27Iuvg==, and will be made available to the Court upon request.

iii. $1,326.80 at Ari (a men's clothing store) in Miami on January 31, 2024;

iv. $3,532.83 at El Palacio de Hierro (a department store in Mexico) on March 2, 2024;

v. $7,274.40 at Stanley Korshak (a Dallas luxury goods store) on March 30, 2024.

vi. $2,200 for a commercial flight for [Sojka's] girlfriend On April 16, 2023;

vii. $7,579.85 for a one-night stay for [Sojka], and possibly his girlfriend, at Stanly Ranch, an upscale hotel in Napa, California, on October 12, 2023;

viii. $7,542.17 for a stay at The Georgian Hotel in Santa Monica, CA on October 28, 2023;

ix. $3,497.80 for a commercial flight for [Sojka's] girlfriend on October 31, 2023;

x. $4,188.67 for a vacation stay at Stanly Ranch on November 5, 2023;

xi. $2,667.65 for a stay at the Hotel Alma in Barcelona, and $2,507.63 for a stay at The Hoxton Hotel in Barcelona, for [Sojka] and his girlfriend from November 28-30, 2023;

See *Affirmation of David Eisenman* dated May 29, 2024 (the "Eisenman May 2024 Aff."), attached to the Mazur Aff. as Ex. 2, ¶¶ 169-176.

Eisenman further details Sojka's use of corporate funds for wine and liquor, pet expenses, a personal trainer, and a $30,000 charge at an antique store. *Id.* Eisenman says that Sojka used the Debtor's funds to pay the first month's rent for an unrelated real estate holding company that the partners co-owned in New Jersey called 195 Throckmorton LLC. *Id.* ¶ 178. The Debtor's CFO reported that this payment was part of Sojka's attempt to create "fictitious leases and sham rental income" to fool the Debtor's lender Bank of America. *Id.* ¶ 179. Eisenman details larger siphoning of Madwell's assets by Sojka, including three 2024 transfers to a Sojka-controlled company called GF 620 Park LLC ("GF620") totaling more than $373,359. *Id.* ¶¶ 189-191. Eisenman later discovers that $100,000 of the GF620 funds were used to pay VOA Ventures LLC, a private jet company. *Affirmation of David Eisenman* dated July 8, 2024 (the "Eisenman July

2024 Aff."), Ex. 3 to the Mazur Aff., ¶¶ 4-5, and Exs. A and B thereto. According to Eisenman, another $92,825 went to Gabriel Road Lot 20, LLC, a company that Sojka was using to acquire and build a cabin in Bethel, New York. *Id.* ¶¶ 6-7, and Ex. C thereto. Sojka had told the New York court that the money was for Madwell business expenses. *Id.* ¶ 9.

Eisenman also alleges that Sojka set up new entities that he controlled for the purpose of receiving payments from Madwell's clients, even while Madwell employees continued to service those clients. Eisenman May 2024 Aff. ¶¶ 193-195. Those clients included e.l.f. Cosmetics, which was directed to deposit payments meant for Madwell into a company called "Monoceros LLC (DBA 'Madwell Ventures'[)]." *Id.* ¶ 194. In some cases, Eisenman details how Sojka simply seems to have directed Madwell clients to deposit money into his own personal account, as was the case with its client Big Dog Natural. *Id.* ¶ 196-197. This practice of diverting clients and revenue may have comprised the most significant transfers of value away from the Debtor.

The filing alleges that Sojka opened countless new entities, including one called If You Believe In Me I Believe in You ("IYBIMIBIY") to divert Madwell's funds. *Id.* ¶ 198. In a separate affirmation, Eisenman relates that he discovered that Sojka used IYBIMIBIY to receive a transfer of over $1.1 million from an unknown payor, with the funds having been transferred from an account held at the Bank of Texas. *Affirmation of David Eisenman* dated September 2, 2024 (the "Eisenman Sept. 2024 Aff."), Ex. 4 to the Mazur Aff., ¶¶ 16-17. When Eisenman's counsel attempted to subpoena the bank records that would have identified the source of those funds, Sojka succeeded in having the subpoena quashed. Later, an exposé published in AdWeek in March 2025 revealed that Sojka used IYBIMIBIY to purchase a private jet for $17.5 million. The "AdWeek Exposé" at 8, a true copy of which is attached as Ex. 5 to the Mazur Aff. The article also details Sojka's alleged drug and alcohol abuse, as well as a single launch party in Los Angeles where

Sojka caused Madwell to spend over $1mm, only a portion of which was ultimately reimbursed by the client. *Id.* at 4, 6.

Despite the Debtor having represented to the Court that the private jet is not property of the Debtor's bankruptcy estate[5], Madwell told a different story in *Sojka v. Eisenman*. The Debtor represented *in a signed pleading* that as early as April 2024, Madwell was planning to purchase its own aircraft for business purposes. An excerpt of that pleading is attached as Ex. 6 to the Mazur Aff. Therein, the Debtor represented that "Madwell often relies upon private aircraft to transport teams, expensive equipment, and/or talent to remote locations (e.g., for commercial motion picture production work)." *Id.* at 15. The pleading continues: "neither Mr. Sojka nor his executives are proceeding with the Eisenman-blocked plan to acquire and generate revenue from an aircraft by leasing it in the foreseeable future or until Madwell is able to recover from Eisenman's ongoing sabotage of its accounts and systems." *Id.* Clearly, Sojka saw the airplane purchase or lease as a Madwell investment.

Another company that Sojka opened to service former Madwell clients was Impossible Outcomes Company LLC ("Impossible Outcomes"). Following Madwell's closure, Sojka seems to have simply transferred whatever remaining clients there were to Impossible Outcomes. According to a LinkedIn page of its employee Chris Belmore, Impossible Outcomes is a Madwell successor, attending to (Madwell's) "legacy" clients:

i. [Belmore] [j]oined Madwell to lead business leadership and strategy across key accounts, then transitioned as part of the founding leadership team that established The Impossible Outcomes Co. following Madwell's closure.
ii. [Belmore] [d]irected strategy and account management for legacy and new clients including Hyland's and Ozium, driving growth and retail integration initiatives.

A copy of Belmore's LinkedIn page is attached to the Mazur Aff. as Ex. 7.

[5] As stated by Debtor's counsel at a hearing held on December 17, 2025 on the Debtor's Motion to Extend Time.

On information and belief, Hyland and Ozium are former clients of Madwell. Tellingly, the Motion itself is supported by a *Declaration of Robert Delgado in Support* (the "Delgado Decl., ECF 24), where Mr. Delgado says that he worked for Madwell as a Chief Financial Officer (for a mere seven weeks) before he transitioned to be CFO of Impossible Outcomes.

### ***B. Madwell is Generally Not Paying its Obligations, Including those Owed to the Original and Joining Petitioners***

Mismanagement at Madwell caused the Debtor to be unable to pay its obligations, including those owed to each of the Petitioners. Each of the petitioners is contractor or freelancer who provided creative services to Madwell toward the end of 2024 into the beginning of 2025. In each case, the Petitioner had unpaid invoices issued to Madwell[6]. As demonstrated in each of the Petitioner Affs., and in the previously filed Joinder Decls., in each case Madwell acknowledged the respective debt and in some cases even the exact amounts due. Prior to the filings in the instant case, Madwell never asserted any defenses to any of the petitioners' claims, even after they threatened the instant filing. A current summary of the Petitioners' claims is as follows:

| **Name of Original Petitioner** | **Nature of Petitioner's Claim** | **Amount of the claim above the value of any lien** |
|---|---|---|
| Laundry Design LLC | Services rendered | $ 213,010.00 |
| Freelunch Forever LLC | Services rendered | $ 10,149.10 |
| Kruh in Vino, Storitvene Dejavnosti, D.O.O. | Services rendered | $ 50,000.00 |
| Hiteny S.A. | Services rendered | $ 213,650.00 |
| Coupe Studios Music & Sound Design, LLC | Services rendered | $ 59,050.00 |
| Naujelis Enterprises Inc. | Services rendered | $ 18,000.00 |
| | Subtotal of original petitioners' claims | **$ 563,859.10** |
| | | |
| **Name of Joining Petitioner (§ 303(c))** | | |
| DMB USA LLC | Services rendered | $ 94,697.25 |
| XNC Incorporated | Services rendered | $ 4,000.00 |
| Knock it Out Records LLC | Services rendered | $ 89,125.00 |
| Lagland LLC | Services rendered | $ 280,000.00 |
| | Subtotal of joining petitioner claims | **$ 467,822.25** |

[6] In the case of KIV and Freelunch, the invoices were nominally issued to "Starfish Projects", a Madwell dba. As will be discussed *infra*, Madwell acknowledged those obligations in writing.

The Petitioner Affirmations and the Joinder Declarations demonstrate that Madwell never disputed any of the claims – indeed, in each case, Madwell explicitly acknowledged the obligation, sometimes even by the exact amount:

i) Laundry: is owed money for creative services. Madwell's director of operations sent Laundry an email on March 26, 2025 offering to pay Laundry 16 bi-weekly installments of $13,313.13 each (an amount totaling $213,010.08), or exactly eight cents more than Laundry's instant claim. Laundry Aff. ¶ 7, and Ex. B thereto.

ii) Freelunch: is a creative service provider. Madwell made a partial payment of $1,500 toward Freelunch's $11,649.10 invoice, leaving an obligation of $10,149.10. Freelunch Aff. ¶¶ 3-7, Exs. A, B thereto. Madwell previously made a written offer to pay the remaining balance over 4 bi-weekly installments of $2,537.28 each (an amount totaling $10,149.12), or exactly two cents more than Freelunch's instant claim. *Id.* ¶ 8, and Ex. C thereto.

iii) KIV: is owed a remaining $50,000 for services, after Madwell made a pre-payment. KIV Aff. ¶¶ 3-6, Exs. A and B thereto. Madwell asserted a series of excuses for non-payment, mostly relating to its own liquidity problems, and at one point Sojka writes cryptically "It's not clear to be from this exchange if you would prefer 100% or nothing?" *Id.* Ex. C thereto.

iv) Hiteny: has eleven unpaid invoices for services rendered to Madwell. Hiteny Aff., ¶ 3, and Ex. A thereto. Madwell's employee Cin Bautista, from the finance department, sent Hiteny an email in December 2024 apologizing for the long delays in payments, but promising to make payments in the following weeks: "I saw you remail with the new invoices and wanted to follow up. I am sending a $15k payment today and hope

to send another by the end of the week, after the holiday. The conversations are still ongoing – we are doing our best to resolve this as quickly as possible so we can finally move past this situation." *Id.* ¶¶ 6-7, and Ex. B thereto.

v) Coupe: provided creative services to Madwell and is owed $59,050 as of the Petition Date. Coupe Aff. ¶ 3, and Ex. A thereto. Madwell's Colin McKenzie acknowledges the debt in writing and proposes to pay the balance with a series of payments for $6,000 each, followed by a final payment for $5,0509. *Id.* ¶ 6, and Ex. B thereto.

vi) Naujelis: is owed $18,000 for creative direction and copywriting services. Naujelis Aff. ¶ 3, and Ex. A thereto. Following nonpayment, Naujelis reached out to Madwell in October 2024 and offered to split the initial invoices and remaining work into 8 installments of $6,000.00 and 1 installment of $4,800 to be paid weekly, totaling $52,800. Of the proposed payments, only 6 were paid, out of order and off schedule over the next several months, leaving $18,000 unpaid. *Id.* ¶ 7, and Ex. C thereto. For that remaining balance, Madwell sent an email in March 2025 offering to make six bi-weekly payments of $3,000 each (total $18,000). *Id.* ¶ 8, and Ex. D thereto. Madwell made none of those payments. *Id.*

vii) DMB: rendered creative services to Madwell, for which Madwell paid only $20,000, leaving an outstanding balance of $94,697.25. DMB Decl. (ECF 19-1) ¶¶ 3, 8. Madwell made the typical excuses for nonpayment (but never disputed the debt). *Id.* ¶¶ 5-7. Madwell wrote in December 2024 "I will flag this payment as urgent and have our head of finance, @Cin Bautista reach out with a form of payment." *Id.* ¶ 7, and Ex. B thereto.

viii) XNC: provided editing and animation services to Madwell and is owed $4,000. XNC Decl. (ECF 21-1) ¶ 3, and Ex. A thereto. On May 1, 2025 a Madwell employee texted XNC to say "I feel strongly about making this right. *Id.* ¶ 7, and Ex. B thereto. Madwell never paid.

ix) Knock it Out: provided creative services to Madwell, and is owed $89,125 as of the Petition Date. Knock it Out Decl. (ECF 20-1) ¶ 3, and Ex. A thereto. Madwell's Colin McKenzie acknowledged the debt in writing, and proposed to pay the balance over 15 bi-weekly payments of $5,941.67 each (total $89,125.05), five cents more than Knock it Out's instant claim. *Id.* ¶ 6, and Ex. B thereto.

x) Lagland: is owed $200,000 for creative services plus a $80,000 "artist fee." On February 5 2025, Sojka told Lagland: "You are at the top of my list." Lagland Decl. (ECF 28-1) ¶¶ 4-8, and Exs. thereto

### *C. Madwell's Sojka Tries to Deflect Blame to his Former Partner Eisenman, and Pretends to Hire an Outside Forensic Accounting Firm (That Does Not Exist)*

In one surprising – but telling – response to a petitioner's insistence on payment, Sojka called petitioner Brian Naujelis to tell him that the non-payment was the result of Madwell being the victim of a fraud. Sojka said that Madwell was conducting an internal investigation into that fraud, which he blamed on Eiseman. Sojka then texted Naujelis what looks to be a forged, fictitious forensic report titled "The Eisenman–Madwell Financial Conspiracy." The "Foxhunt Report," Naujelis Aff. ¶ 10, and attached at Ex. E thereto. The report is purportedly authored by an accounting firm called "Foxhunt Forensic, a division of NullCo" – a firm that does not seem to

exist.[7] *Id.* This two-part strategy – 1) blame Eisenman; 2) pretend to be investigating the insider fraud at Madwell – continues to this day, as manifested in the Motion.

Realizing that they were not going to get payment from Madwell, only delays and excuses, and that Sojka's "investigation" was a sham, the original six Petitioners filed the Petition in this Court, initiating these proceedings.

## ARGUMENT

While Petitioners believe that there was massive insider fraud at Madwell (as acknowledged in the Motion), the details of that fraud are not especially relevant in the context of the Court's analysis of the Motion. Who perpetrated the fraud, whether Sojka or Eiseman or some other insider, is not material to the propriety of an involuntary bankruptcy petition. In fact, the Petitioners need not demonstrate any corporate malfeasance at all - only that they meet the simple statutory requirements for having filed the Petition, and that they filed the Petition in good faith.

### *A. The Petition was Proper, and Madwell is a Proper Involuntary Debtor*

Under section 303(b)(1) of the Bankruptcy Code, an involuntary petition may be commenced "by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... if such noncontingent, undisputed claims aggregate at least [$18,600] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1). A petitioning creditor must satisfy both prongs of this test; the claim must not be subject to a bona fide dispute as to either liability or as to amount." *In re Aminian*, No. 07-12957 (AJG), 2008 WL 793574, at *2 (Bankr. S.D.N.Y. Mar. 25, 2008).

[7] Certain specific style choices suggest that Sojka may have gnerated the report, possibly with artificial intelligence.. For example, the report file name is 'E-M FC FF Audit1ø7 061225.' The "ø" symbol, a Scandinavian vowel letter, is also featured heavily in the branding for Sojka's Impossible Outcomes LLC, which uses the vowel as a logo and, and for spelling "Impøssible." (a screenshot from www.impossibleoutcomes.co is attached to the Mazur Aff. as Ex. 8). The "Fox" in "Foxhunt" is also a Sojka theme – Sojka planned to name the Madwell jet "FoxAir."

As described in the Petition, in the various Joinder Decls., and in the accompanying Petitioner Affs., the ten Petitioners hold claims against the Debtor in an unsecured amount totaling $751,681.35.[8] See Petition (ECF 1); Petitioner Affs.; Joinder Decls. at ECF 19-21, 28. These obligations are detailed in the respective invoices for the services that each petitioner rendered to Madwell. *Id.* The amounts owed are not subject to *bona fide* dispute within the meaning of sections 303(b) or 303(h)(1) of the Bankruptcy Code, as there is no objective basis on which Debtor may dispute its liability to Petitioners, or the amount of their claims. See *Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC),* 793 F.3d 228, 234 (2d Cir. 2015) (bankruptcy courts should apply objective standard to determine whether bona fide dispute exists); The purported disputes raised in the Motion are simply not bona fide, as will be discussed *infra*. Also, by pretending to dispute only the claims of KIV, Freelunch and Laundry, the issue becomes moot. There are still six remaining petitioners, where there is no dispute as to their claim (bona fide or otherwise), and any combination of which satisfies the low statutory bar.

Under section 303(h) of the Bankruptcy Code, after the filing of a motion to dismiss controverting the petition, and following a trial:

> … the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
>
> (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount; or
>
> (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession. 11 U.S.C. § 303(h).

[8] The original Petition details the claims of Laundry, Freelunch, KIV, Hiteny, Coupe and Naujelis, totaling $563,859.10. The $751,681.35 total includes the claims of later joining petitioners DMB ($94,697.25), XNC ($4,000), Knock it Out ($89,125) and Lagland ($280,000).

Helpfully, in the instant case, the Debtor admits that it is not paying its debts as they become due and is insolvent. Motion at 5. The existence of parallel litigation against Madwell further confirms this fact. In addition to the Bank of America action, the Court should take judicial notice of the following pending actions against Madwell:

- *IPH, LLC v. Madwell LLC* et al., Sup. Ct. Kings County, Index No. 530477/2025, filed Sept. 4, 2025, landlord lawsuit against the Debtor for $ 518,544.55, plus accruing rent;
- *U.S. Bank National Association v. Madwell LLC* et al., Sup. Ct. Kings County, Index No. 526031/2025, filed Aug. 1, 2025, action by equipment financer for $292,731 plus accruing interest and charges;
- *American Express National Bank v. Madwell LLC* et al., Sup. Ct. Kings County, Index No. 523581/2025, filed July 16, 2025, for $877,011 plus accruing interest and charges;
- *Woods v. Madwell LLC* et al., Sup. Ct. Kings County, Index No. 521238/2025, filed June 26, 2025, by a former employee against the Debtor for $50,000;
- *Red Creek Productions, LLC v. Madwell LLC d/b/a Starfish Production Company*, Sup. Ct. N.Y. County, Index No. 652925/2025, filed May 12, 2025, by trade vendor for $47,943.81; and
- *The New York Times Company v. Madwell LLC* et al., Sup. Ct. Kings County, Index No. 514191/, filed April 17, 2025, for breach of contract in the amount of $37,176.

As of the time of preparing this Opposition, Madwell had not answered or otherwise responded to any of the actions listed above, suggesting that these debts are also undisputed.

The Court should enter an order for relief when a debtor is "generally not paying such debtor's debts as they become due unless such debts are subject to a bona fide dispute." Bankruptcy Code § 303(h)(1). "In order to make a factual determination on this issue, courts generally 'look

at the number of claims that the debtor has not paid, the amounts of these unpaid claims, the materiality of the non-payments, and the debtor's overall financial condition and affairs.'" *In re Paper I Partners, L.P.*, 283 B.R. 661, 677 (Bankr. S.D.N.Y.2002) (citation omitted); *In re Euro–American Lodging Corp*., 357 B.R. 700, 713 (Bankr.S.D.N.Y.2007); *In re Amanat*, 321 B.R. 30, 39 (Bankr.S.D.N.Y.2005). In *In re Fischer*, the district court found that the "generally not paying" standard could apply even when there were only two debts outstanding. 202 B.R. 341 (E.D.N.Y. 1996). The Court may also look at whether the debtor has terminated its business operations entirely, and whether the past debts that are due are extremely large in comparison to the debtor's assets. *In re B.D. Int'l Discount Corp*., 701 F.2d 1071, 1074 (2d Cir.1983). In the instant case, the Court has been presented with evidence of widespread non-payment of Madwell's obligations, whether to the Petitioners or to the various plaintiffs in the actions identified *supra*. The obligations are material with respect to their amounts, compared to the Debtor's lack of meaningful assets. The Debtor is defunct and presently not operating, after a period of mismanagement.

Also, under prong two of section 303(h) of the Bankruptcy Code, it appears that "within 120 days before the date of the filing of the petition, a custodian…was appointed or took possession" of substantially all of the Alleged Debtor's assets. On October 10, 2025, 17 days before the Petition was filed, Bank of America obtained the BoA Turnover Judgment, which effectively appointed the bank as a custodian for Madwell's assets. It stems from a settlement agreement, where Madwell "agreed that the Bank [of America] has a valid, perfected and fully enforceable lien on substantially all of the Obligors' assets…" BoA Turnover Judgment at 1. In that same judgment, Madwell is directed to turn over all of the collateral to the bank. *Id.* at 2.

### ***B. There are no 'Bona Fide' Disputes as to Any of the Petitioner's Claims, and the Motion Raises <u>No Disputes Whatsoever</u> as to Seven of the Petitioners' Claims***

This Court has seen its share of involuntary bankruptcy petitions, and it has confronted the issue of whether disputes as to petitioning creditors' claims are "bona fide" or not. See *In re David Amrusi,* Case No. 23-44588-ess, *Memorandum Decision*, ECF 44, (Bankr. E.D.N.Y. Sept. 30, 2025); *In re Simon Taub*, Case No. 10-4155, *Decision*, ECF 12, (Bankr. E.D.N.Y. Sept. 7, 2010). As the Second Circuit explained, whether a bona fide dispute exists is a matter of whether there is an objective basis to consider the claim to be subject to a legal or factual dispute. *Amrusi* at 22.

> Courts apply an objective test in determining whether a bona fide dispute exists. *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 117-18 (2d Cir. 2003), abrogated on other grounds by *Adams v. Zarnel (In re Zarnel),* 619 F.3d 156 (2d Cir. 2010). A court must "determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." [*In re BDC* 56, 330 F.3d] at 117 (internal quotation marks and alteration omitted). There is a bona fide dispute if "there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts."

*In re TPG Troy, LLC*, 793 F.3d at 234. Congress "intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." *Id.* (quotation marks omitted). This is because "[a]n involuntary bankruptcy case cannot be the means of pressuring a debtor to pay a legitimately disputed debt." *Id.* Therefore, for a petitioning creditor to be eligible to commence an involuntary bankruptcy case, the creditor must not only establish that it is a creditor of the alleged debtor, it must also establish "a prima facie case that no bona fide dispute exists" as to the debt. *Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 118 (2d Cir. 2003). "Once a prima facie case has been established, the burden shifts to the debtor to demonstrate the existence of a bona fide dispute. *Id.*

In the instant case, the Petitioners' respective invoices, along with clear, written acknowledgments of the respective debts by Madwell, provide that prima facie case. See Petitioner Affs., Joinders, and the exhibits thereto. For example, in the case of Laundry's $213,010 claim, Madwell had offered to pay the debt in 16 bi-weekly installments of $13,313.13 each (an

amount totaling $213,010.08). Laundry Aff. ¶ 7, and Ex. B thereto. In the case of Coupe, which asserted a claim in the amount of $59,050, Madwell sent an email offering to pay the debt setting forth a schedule of 8 bi-weekly payments of $6,000, starting on May 8, 2025, with a final payment of $5,050 to reach the total. Coupe Aff. ¶ 6, and Ex. B thereto. Hiteny had communications with Madwell, where Madwell's responses all focused on the timing of any payments, and never challenged the amount due. Hiteny Aff. ¶ 7, and Ex. B thereto

Even for the two petitioners where the Debtor is suddenly alleging that the debts are owed by a subsidiary called Maple Syrup & Jam, LLC ("Maple Syrup"), and where invoices were issued to "Starfish Projects" (in the case of petitioners KIV and Freelunch), there are clear indications that Madwell acceded to the debts and even paid them down partially. KIV received a partial payment from Madwell on March 7, 2025 after many back-and-forth texts. KIV Aff. ¶¶ 6-9. When KIV's principal escalated the matter to include Sojka in the chain, he merely responded to inquire into the amount owed, never raising any disputes or defenses, or suggesting that some other company owed the money. *Id.* ¶ 10. The situation with Freelunch is even clearer. There, Madwell (not Maple Syrup) partially paid down the balance due. Freelunch Aff. ¶ 10, and Ex. B thereto. Later, regarding the remaining open balance of $10,149,10, Madwell's CFO offered to pay the amount "over 4 bi-weekly installments of $2,537.28 each" (i.e. a total of $10,149.12). *Id.* ¶ 10, and Ex. C thereto. The account was stated by the Debtor under common law. The Debtor seems to suggest, just because it created a subsidiary called Maple Syrup & Jam LLC dba Starfish, that i) Madwell cannot also have been doing business as "Starfish Projects," despite clearly having done so; and ii) that any assertion of the KIV or Freelunch claims against Madwell is akin to a claim asserted under an "alter ego" theory. KIV and Freelunch assert claims against Madwell, which Madwell has ratified, because Madwell conducted business under the name Starfish

Projects. Madwell's attempt to re-direct this claim to another entity is asserted on the flimsiest grounds, for the purposes of misleading the Court. Tellingly, the Debtor asserted none of these arguments upon receiving the Petitioners' October 8, 2025 Demand Letter, suggesting that the argument was only concocted for the instant Motion.

Fortunately, the Court need not dive into a fact-based inquiry into whether the Motion succeeds in demonstrating the existence of a "bona fide" dispute against petitioners Freelunch, KIV and Laundry. Even if there were bona fide disputes as to these three creditors, ***there are seven other petitioning creditors who have undisputed claims exceeding the statutory minimum***. The joining creditors have a statutory right to join as petitioning creditors under Bankruptcy Code 303(c). The Motion cites to bad, superseded law now called the "bar-to-joinder doctrine," as memorialized in *Basin Elec. Power Co-op. v. Midwest Processing Co*, 769 F.2d 483 (8th Cir. 1985). That Court held that subsequent joining petitioning creditors cannot "cure" certain defects, including bad faith, among the original petitioners.

The "bar-to-joinder doctrine" is not universally adopted. Bankruptcy Code 303(c) provides that creditors with noncontingent claims may join in the petition and may do so before the case is dismissed or relief is ordered, "with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.: 11 U.S.C. § 303(c). "Nothing suggests that the courts are authorized to interpose conditions upon joinder by qualifying creditors." *In re Kidwell*, 158 B.R. 203, 211 (Bankr. E.D. Cal. 1993) (the case includes an extended discussion of the bar-to-joinder doctrine, which has "has lost its vitality," and the specifics of the *Basin Elec. Power Co-op* decision). Later-joining petitioners cannot be barred from the joinder even if one or more of the original petitioners is found to have filed the petition in bad faith. *In re Kidwell*, 158 B.R. at 219. "[T]he 'bar to joinder doctrine' is inconsistent with the unambiguous plain language of

section 303(c), which this Court is required to construe strictly." *In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. 906, 908 (Bankr. D. Del. 2010) (citation omitted). Even in the Debtor's favorite decision, *In re Forever Green Athletic Fields, Inc*. from the 3rd Circuit, the Court declines to take a stance on the bar to joinder issue. 804 F.3d 328, 338 (3d Cir. 2015) ("A growing minority [of Courts], however, find [bar to joinder] unjustified because it blindly lumps good- and bad-faith filers together and needlessly punishes everyone.")

In 2010, the Second Circuit revisited the bar-to-joinder doctrine in the context of an involuntary bankruptcy petition, ruling that "the ineligibility of creditors under the restrictions in § 303(b) does not prevent the case from being commenced." *In re Zarnel*, 619 F.3d 156, 167 (2d Cir. 2010). The decision stemmed from the Supreme Court decision in *Arbaugh v Y & H Corp*. and partially abrogated the prior *In re BDC 56 LLC* decision. *Arbaugh v. Y & H Corp*., 546 U.S. 500, 503, 126 S.Ct. 1235, 1237, 163 L.Ed.2d 1097 (2006) ("…when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character"). So even if one or more of the Original Petitioners herein participated in bad faith (and no evidence suggests they did), that fact does not deprive this Court of jurisdiction over Madwell, nor does it bar subsequent good faith Joinder Petitioners from exercising their rights as creditors.

### ***C. The Debtor Has Not Demonstrated Any Bad Faith in the Petitioners' Decision to File the Petition***

The caselaw cited in the Motion with respect to the purported "bad faith" of Petitioners is easily distinguishable from the instant facts. Any attorney perusing caselaw in the involuntary bankruptcy context will soon find a trove of cases where the petitioners acted poorly, sometimes very poorly – filing involuntary petitions with a single creditor instead of in a group, filing the petition in the midst of acrimonious litigation with the Debtor, filing with claims that are clearly

in dispute, etc. All of the cases cited in the Motion, including the heavily cited *In re Forever Green Athletic Fields, Inc.* case, fall into this category.[9] [10] The Motion argues that the instant facts are "analogous to what creditors did in *In re Forever Green* and *In re Murray*." Motion at 18. But those fact patterns bear little resemblance to the instant facts, where the petitioning creditors form a large group, where the claims are well documented, where the claims had never been disputed by the Debtor (prior to the Motion), where the Debtor had even acknowledged the claims in writing, and where the Petitioners were not involved in any litigation with the Debtor whatsoever.

None of the *Forever Green* factors identified in the Motion are present in the instant fact pattern. Motion at 16; *see In re Forever Green*, 804 F.3d at 336; *see also CNG Foods*, 2020 WL 4219679, at *11 (Bankr. E.D.N.Y. July 13, 2020) (quoting *In re Forever Green*). Here:

a) The Petitioners have more than satisfied the statutory requirements for filing the Petition. The Petitioner Affs. and Joinders show that the claims are well-vetted, sum-certain breach of contract claims, with ten petitioners total.

b) The involuntary Petition is meritorious, because in addition to the valid, statutorily sufficient claims under Bankruptcy Code § 303(b), the Debtor is shown to be a defunct, insolvent entity that is generally not paying its obligations as per § 303(h)(1). Bank of America has taken possession of substantially all of the Debtor's assets (See the BoA Turnover Judgment), thus satisfying both prongs of § 303(h)(2).

---

[9] *In re Forever Green Athletic Fields, Inc.* alleged debtor Forever Green had "essentially shut down its business," and its largest remaining asset was a $5 million claim for diversion of corporate assets against an entity owned by the Chapter 7 creditors, which claim was in pending arbitration. 804 F.3d 328, 331-332 (3d Cir. 2015). The Chapter 7 creditors had obtained a $300,000 judgment against Forever Green in a separate action and, two weeks before their brief was due in the arbitration, the creditors filed an involuntary bankruptcy petition against Forever Green for the purposes of frustrating the arbitration. *Id.* at 331.

[10] The Motion also cites *In re Murray*, an involuntary Chapter 7 case that was "basically a two-party dispute between debtor and single, petitioning creditor." 900 F.3d 53 (2d Cir. 2018). There, a single judgment creditor used an involuntary bankruptcy filing for the purposes of enforcing a judgment against a Manhattan coop owned by the debtor Murray and his wife. *Id.* at 57. Bankruptcy law permitted a forced sale of the entire coop, while state law remedies would have only allowed the creditor to execute the judgment against the debtor's interests, only. *Id.*

c) The Petitioners made "reasonable inquiry into the relevant facts and pertinent law before filing," as evidenced by the declarations in the Petitioner Affs., the Joinders, and the exhibits thereto. Petitioners were faced with a Debtor that had essentially shut down. The AdWeek Exposé revealed widespread insider fraud, and Petitioners' subsequent communications were answered with endless excuses and obvious misrepresentations, such as the Foxhunt Report (i.e. ample "evidence of preferential payments to certain creditors or of dissipation of the debtor's assets").

d) The filing was certainly not motivated by ill-will or a desire to harass. Through counsel, Petitioners send a demand letter requiring payment of their claims. They only sought payment of valid, undisputed debts. All of the communications highlighted in the Motion as somehow evidencing bad faith clearly demonstrate that the Petitioners sought only to vindicate their rights to payments duly owed.

e) There is no "disproportionate advantage" for the Petitioners. Despite the Motion's insistence on the Petitioners' "improper purpose," and unlike in *Forever Green,* there is no way that the filing of the instant Petition can possibly benefit the Petitioners to the detriment of Madwell's other creditors. In fact, a Chapter 7 liquidation, with an actively engaged Chapter 7 trustee pursuing claims against insiders like Sojka and other transferees, is the only hope for recovery for any of Madwell's creditors. And in such a recovery, there would be no improper preference for the Petitioners.

f) The Petitioners were not seeking "tactical advantage in pending actions," because none of the Petitioners were involved in non-bankruptcy actions at the time of filing.

g) The filing was not a "substitute for customary debt-collection procedures," because Madwell has already had all of its assets foreclosed on by Bank of America. Normal

debt-collection procedures would have been ineffective. Bankruptcy was and is inevitable for Madwell, and it is the appropriate equitable forum for its creditors.

h) The filing did not have "suspicious timing." In fact, the entry of the BoA Turnover Judgment, contrary to the argument in the Motion, provided just one more motive for the filing, as a supporting factor under Bankruptcy Code § 303(h)(2). The Motion fails to explain how filing the Petition could allow the Petitioners to "jump the line of creditors, including BOA." Motion at 19. Just the opposite, bankruptcy is a procedure meant to prevent races to judgment and allow for orderly and equitable distributions.

None of the cases cited by the Debtor suggest that simply demanding payment prior to an involuntary bankruptcy filing is an indication of bad faith. Nor do those cases deal with a single petitioner demanding payment from a non-debtor after a bankruptcy filing. But regardless of any finding of bad faith, one creditor's bad faith involuntary bankruptcy petition against debtor does not bar joinder of valid claims of other creditors, as discussed, *supra.* Innocent petitioners should not have their rights to petition in bankruptcy foreclosed by the actions of other creditors.

### ***D. Abstention under Section 305(a)(1) of the Bankruptcy Code is Not in the Interests of Creditors or the Debtor***

"The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if ... the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a)(1). "The moving party bears the burden to demonstrate that the interests of the debtor and its creditors would benefit from dismissal or suspension of proceedings under § 305(a)(1)." *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462–63 (Bankr. S.D.N.Y. 2008) (citation omitted). "The courts that have construed § 305(a)(1) are in general agreement that abstention in a properly filed bankruptcy case is an extraordinary remedy, and that dismissal is appropriate under § 305(a)(1) only in the situation

where the court finds that both 'creditors and the debtor' would be 'better served' by a dismissal." *In re Eastman*, 188 B.R. 621, 624 (9th Cir. BAP 1995). In determining whether to grant relief under section 305(a), courts will consider the following:

> 1) The economy and efficiency of administration;
> 2) Whether another forum is available to protect the interests of both parties or there is already a pending proceeding in a state court;
> 3) Whether federal proceedings are necessary to reach a just and equitable solution;
> 4) Whether there is an alternative means of achieving an equitable distribution of assets;
> 5) Whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case;
> 6) Whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and
> 7) The purpose for which bankruptcy jurisdiction has been sought.

*In re Paper I Partners, L.P.*, 283 B.R. at 678 (*citing In re 801 South Wells Street Ltd. Partnership*, 192 B.R. 718, 723 (Bankr.N.D.Ill.1996)); *In re Trina Assoc.*, 128 B.R. 858, 867 (Bankr.E.D.N.Y.1991).

The Motion puts little effort into proving any of the above factors to justify abstention under section 305(a). There is no proposed alternative to the instant proceedings, except for an unsupervised Debtor-led "investigation" into itself. There is no state court windup, no proposed independent fiduciary, and no assignment for the benefit of creditors or the like. An abstention here would only serve the interests of Sojka, who would use his sham investigation to bury his own alleged malfeasance. Sojka already misrepresented to creditors in creating the fake "Foxhunt Report," a document that was clearly intended to give the impression that he had hired an outside accounting firm. The instant "investigation" is the next iteration of the same ruse.

### *E. The Debtor Fails to Explain a Plausible Need for Discovery on the Motion to Dismiss*

The Motion seeks a period of discovery "(i) from Petitioners regarding the purpose of this Chapter 7 proceeding and whether their alleged claims meet the statutory requirements for bringing a Chapter 7 proceeding, and (ii) third parties with information potentially relevant to the Investigation." Motion at 25. What the Debtor really seeks is further delay. The Debtor could simply examine its own bank records to determine that it did not make double payment to petitioner Laundry, for example. Madwell has not even pretended to dispute the debts owed to Hiteny, Coupe, Naujelis, DMB, XNC, Knock it Out, or Lagland, so inquiring into Laundry would be non-dispositive and moot. As to the proposed discovery on third parties "with information potentially relevant to the Investigation," the Motion does not identify who those third parties are or what purpose the "investigation" would serve now that the Petitioners have clearly met their statutory requirements for the bankruptcy filing. Any further investigation should be conducted by an appointed Chapter 7 Trustee. Further discovery is unwarranted and would only serve to waste time and resources.

## **CONCLUSION**

For the foregoing reasons, the Petitioners respectfully request that the Motion be denied in its entirely, and that the Court enter an order for relief and the appointment of a chapter 7 trustee.

Dated: January 29, 2026
Scarsdale, New York

SARACHEK LAW FIRM

*Zachary Mazur*
Zachary E. Mazur, Esq.
670 White Plains Road, #PH
Scarsdale, NY 10583
(646) 517-5420 ext. 106
zachary@saracheklawfirm.com
*Attorney to the Petitioning Creditors*

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2026, a true and correct copy of the foregoing *Petitioning Creditors' Opposition to Motion to Dismiss Involuntary Chapter 7 Petition* has been served on all counsel of record via electronic filing with the Clerk of Court using the CM/ECF system.

Dated: January 29, 2026

SARACHEK LAW FIRM

*Zachary Mazur*

Zachary E. Mazur, Esq.
670 White Plains Road, #PH
Scarsdale, NY 10583
(646) 517-5420 ext. 106
zachary@saracheklawfirm.com
*Attorney to the Petitioning Creditors*