**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>MADWELL LLC,<br><br>*Alleged Debtor*. | <br><br>Chapter 7<br><br>Case No. 1-25-45169-ESS |

**ALLEGED DEBTOR'S REPLY TO PETITIONING CREDITORS' OPPOSITION TO ALLEGED DEBTOR'S MOTION TO DISMISS**

MORVILLO ABRAMOWITZ GRAND
IASON & ANELLO P.C.
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 6

A. The Petition Should Be Dismissed Based on Petitioners' Repeated Use of the Petition as a Tool for Coercion ........ 6

B. Petitioners' Tainted Petition Cannot Be Saved by the Joinder of Additional Alleged Creditors ........ 10

C. Petitioners Have Ignored Madwell and Mr. Sojka's Repeated Offers of Transparency ........ 12

CONCLUSION ........ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basin Elec. Power Co-op. v. Midwest Processing Co.*,
769 F.2d 483 (8th Cir. 1985) .......... 11

*Forever Green Athletic Fields, Inc. v. Dawson*,
514 B.R. 768 (E.D. Pa. 2014) .......... 5, 11

*In re BDC 56 LLC*,
330 F.3d 111(2d Cir. 2003) .......... 11

*In re Centennial Ins. Associates, Inc.*,
119 B.R. 543 (Bankr. W.D. Mich. 1990) .......... 11

*In re FKF Madison Park Grp. Owner, LLC*,
435 B.R. 906 (Bankr. D. Del. 2010) .......... 11

*In re Forever Green*,
804 F.3d 328 (3d Cir. 2015). .......... 5, 9, 10, 11

*In re Kidwell*,
158 B.R. 203 (Bankr. E.D. Cal. 1993) .......... 11

*In re Murray*,
900 F.3d 53 (2d Cir. 2018) .......... 9

*In re Mylotte, David & Fitzpatrick,*
No. 07-11861BIF, 2007 WL 2033812 (Bankr. E.D. Pa. July 12, 2007) .......... 11

*In re Paper I Partners, L.P.*,
283 B.R. 661 (Bankr. S.D.N.Y. 2002) .......... 10

*In re Valuex Research, LLC*,
No. 3:23-cv-01267, 2024 WL 4188464 (D. Conn. Sept. 13, 2024) .......... 5, 6, 8, 9

*In re Zarnel*,
619 F.3d 156 (2d Cir. 2010) .......... 11

**Statutes**

Section 305(a)(1) of the Bankruptcy Code .......... 10

**Other Authorities**

*Bankruptcy Law Manual* § 14:13 (5th ed., Dec. 2025 Update) .................................................... 12

*Norton Bankr. L. & Prac.* § 22:8 (3d ed., Jan. 2026 Update) ...................................................... 12

Madwell respectfully submits this reply brief in further support of its Opposition, Motion to Dismiss, and Request for Discovery in response to the Petition ("Motion to Dismiss").[1]

## PRELIMINARY STATEMENT

Petitioners' Opposition to the Motion to Dismiss is premised on three factual assertions that are flatly contrary to the undisputed record before this Court: (i) that Petitioning Creditor Naujelis's November 11, 2025 text messages to Madwell's principal, Mr. Sojka, supposedly can be read as something other than a *quid pro quo* offer to dismiss the Petition in exchange for a payment from Mr. Sojka personally for alleged Madwell debts that he had (and has) no obligation to pay, Dkt. 29 at 3, (ii) that even if a *quid pro quo* offer, Mr. Naujelis's texts supposedly constituted only an isolated *quid pro quo* offer by a supposedly frustrated creditor acting alone, *id*., and (iii) that Mr. Sojka supposedly "will go to any lengths" to avoid scrutiny into Madwell and its financials, *id*. at 4.

As to the Naujelis texts, they unambiguously reflect a *quid pro quo* offer to dismiss the Petition in exchange for a payment from Mr. Sojka. More importantly, the Naujelis texts were not an isolated *quid pro quo* offer. The texts were sandwiched between communications from Petitioners' counsel to Madwell's counsel that (i) the Opposition wholly ignores, and (ii) when viewed together with the Naujelis texts, reflect a course of conduct in which Petitioners as a whole sought to use the Petition to coerce a *quid pro quo* payment from Mr. Sojka. Importantly, Petitioners do not dispute what their counsel wrote or said to Madwell's counsel. The substance of those communications confirms that (i) before filing the Petition, Petitioners' counsel used the threat of filing the Petition to try to extract a *quid pro quo* payment from Mr. Sojka, stating at one point, "Before we jump on another call, we'd like a proposal to take to our clients.  Money

[1] Capitalized terms herein have the same meaning as in Madwell's opening brief.

talks. Your client has assets," Dkt. 25-2 at 9, and then (ii) after filing the Petition—and the day after Mr. Naujelis made his *quid pro quo* offer to Mr. Sojka, Petitioners' counsel used the possibility of dismissing the Petition during what Petitioners' counsel referred to as the "gap period" to try to extract the same *quid pro quo* payment from Mr. Sojka, Dkt. 25 at ¶ 7.

As to the suggestion that Mr. Sojka is seeking to avoid scrutiny, the record flatly contradicts it. As an initial matter, long before Petitioners filed the Petition, Mr. Sojka reported to the U.S. Department of Justice ("DOJ") the allegation underlying the Investigation referenced in Madwell's opening brief: namely, that a significant fraud seemingly was perpetrated against Madwell. Declaration of Christopher B. Harwood (the "Harwood Reply Decl."), at ¶ 6. Since then, with the assistance of undersigned counsel, Mr. Sojka and Madwell have been providing documents and information to DOJ—specifically, the U.S. Attorney's Office for the Southern District of New York. *Id*. Indeed, they most recently produced documents to DOJ on December 23, 2025, and February 13, 2026. *Id*. That Mr. Sojka reported the matter to DOJ (and together with Madwell, actively is producing documents and information to DOJ) squarely rebuts Petitioners' suggestion that he is seeking to avoid outside scrutiny. Indeed, Mr. Sojka brought upon himself and Madwell the type of scrutiny that one trying to hide wrongdoing would never invite.[2]

Even setting aside Mr. Sojka and Madwell's affirmative outreach to DOJ, in suggesting that Mr. Sojka is seeking to avoid scrutiny, Petitioners ignore that Mr. Sojka repeatedly has offered them full transparency into Madwell. No dispute exists that before Petitioners filed the

[2] Mr. Sojka and Madwell did not see the need to reference the DOJ referral and ongoing productions in their opening brief, but they are directly relevant to—and refute—the theme of Petitioners' Opposition: that Mr. Sojka is supposedly seeking to avoid outside scrutiny of himself and Madwell.

Petition, Madwell's counsel offered to provide Petitioners' counsel (and thus Petitioners) full transparency into Madwell, including by producing Madwell's financials to them. Dkt. 25 at ¶ 5. Madwell's opening brief made clear that that offer remains open, and that it also applies to matters pertaining to the Investigation Madwell's counsel is conducting into the seeming fraud perpetrated against Madwell prior to its collapse. Dkt. 23-1 at 18, 25–26.

Further, on December 23, 2025 (four days after Madwell filed its opening brief), Madwell's counsel and Petitioners' counsel had a Zoom call during which Madwell's counsel not only reiterated the prior offers to produce Madwell's financials to Petitioners, but also specifically offered to produce financials relating to the airplane referenced in Petitioners' Opposition. Harwood Reply Decl., at ¶ 3. As Madwell's counsel explained to Petitioners' counsel previously, Madwell's counsel's understanding is that the funds Mr. Sojka used to acquire his interest in the plane appropriately are characterized as funds that belonged to Mr. Sojka (not Madwell). Dkt. 25-2 at 4–5. But as with all matters relating to Madwell generally, Mr. Sojka wants to be an open book on the subject and therefore, on the December 23 Zoom call, Madwell's counsel specifically offered to produce to Petitioners' counsel all potentially relevant financial records relating to the plane (both its original purchase and subsequent sale). Harwood Reply Decl., at ¶ 3.

In furtherance of the above-referenced offers of full transparency, on January 6, 2026, Madwell's counsel emailed to Petitioners' counsel a draft protective order for submission to this Court, to facilitate Mr. Sojka and Madwell's production to Petitioners of information about Madwell and the plane. *Id.*, Ex. 1 at 1. On January 9, 2026, having received no response regarding the protective order, Madwell's counsel sent an email to Petitioners' counsel following up on the protective order. *Id.*, Ex. 2 at 1. Petitioners' counsel, however, ignored the email, and

to date, has ignored all overtures aimed at providing Petitioners full transparency. Even worse, Petitioners then based their Opposition on the false narrative that Mr. Sojka supposedly is trying to avoid transparency and outside scrutiny.

Mr. Sojka's transparency also extended to what Petitioners refer in their Opposition as "a report from a fictitious forensic accounting firm." Dkt. 29 at 3. After Petitioners' counsel asked Madwell's counsel about the genesis of that report, Madwell's counsel informed Petitioners' counsel that the report was the product of an internal Madwell analysis. Harwood Reply Decl., Ex. 2 at 1. Although undersigned counsel had no involvement in the report's creation (or in any dissemination of it), the central figures reflected in the report are consistent with the corresponding figures calculated in connection with Madwell's counsel's Investigation into the seeming fraud at Madwell. Specifically, the following figures in the report are close or identical to those calculated in connection with the Investigation (as reflected in Madwell's opening brief): (i) Madwell's total inflows according to its Bank of America account statements from 2018 to 2023, (ii) Madwell's total revenue reported on its third-party prepared tax returns from 2018 to 2023, and (iii) Madwell's accrual-based revenue from 2020 to 2023. *Compare* Dkt. 23-1 at 7 *with* Dkt. 36 at 23.

Ultimately, Mr. Sojka and Madwell's position on the Petition remains the same as it was in Madwell's opening brief: No reasonable dispute can exist that the Petition (i) was filed in bad faith to try to coerce an improper *quid pro quo* payment from Mr. Sojka, Dkt. 23-1 at 1, 20–24, and therefore (ii) is subject to dismissal as an "[i]nappropriate use of the Bankruptcy Code," Dkt. 23-1 at 18. Although Petitioners' counsel has sought to cure the taint caused by the Petition's original improper purpose by scrambling after the fact to prompt additional putative creditors to join in the Petition, the bar-to-joinder doctrine prevents such a cure. On that issue, Petitioners are

flat wrong in characterizing the bar-to-joinder doctrine as "bad, superseded law," Dkt. 29 at 19, just like they were wrong when they previously tried to argue that this Court lacked discretion to grant Madwell's motion to extend its deadline to respond to the Petition, Dkt. 9 at 4.

Petitioners presumably made that first wrong argument to try to avoid having the issue of their improper *quid pro quo* offers adjudicated. Now, they apparently hope that by mischaracterizing the bar-to-joinder doctrine as "bad, superseded law," Dkt. 29 at 19, they will get a free pass for having filed the Petition in furtherance of an improper *quid pro quo* scheme. Contrary to Petitioners' assertion, the Second Circuit has not "revisited" the bar-to-joinder doctrine, Dkt. 29 at 20, and as much as Petitioners want to pretend otherwise, it is "the majority rule." *See Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 789 (E.D. Pa. 2014) ("the majority rule [is] that bad faith bars joinder of other petitioning creditors"), *aff'd sub. nom* 805 F.3d 328 (3d Cir. 2015). Further, good reason exists for the bar-to-joinder doctrine, as it disincentivizes creditors (like the Petitioners here) from seeking to misuse the bankruptcy process for their own personal gain.

Indeed, that precise consideration recently led another court in this Circuit to affirm a bankruptcy court's dismissal of an involuntary petition in a case that involves facts *closely analogous* to those here. *See In re Valuex Research, LLC*, No. 3:23-cv-01267, 2024 WL 4188464 (D. Conn. Sept. 13, 2024), *judgment aff'd*, No. 24-2726-bk, 2025 WL 2327172 (2d Cir. Aug. 13, 2025). In *In re Valuex*, an involuntary petition was filed on behalf of eight of the alleged debtor's thirty-eight creditors. *Id*. at *1. Before filing the petition, the petitioning creditors used the threat of its filing to try to extract a *personal guarantee* from the alleged debtor's *principal* to pay the petitioning creditors what they claimed to be owed by the alleged debtor. *Id*. at *3. Notwithstanding the existence of thirty other creditors, the district court

affirmed the bankruptcy court's dismissal of the petition based on the improper actions of the eight petitioners, holding that if their threat had succeeded, they "would have [been put] . . . in a preferential position relative to [the debtor's] other creditors, something deeply at odds with the equitable purpose of bankruptcy." *Id.* at *9. In affirming the bankruptcy court's dismissal of the petition, the court emphasized that "there is a strong public interest in preventing the threat of bankruptcy from being used as a tool for coercion." *Id.*

Using the Petition "as a tool for coercion" is exactly what happened here through Petitioners' *quid pro quo* offers. The Petition thus properly is dismissed. Nevertheless, Mr. Sojka and Madwell continue to welcome their being subject to outside scrutiny. Accordingly, with respect to how to handle the Petition—and consistent with their welcoming of outside scrutiny, *including by DOJ*—Mr. Sojka and Madwell remain open to what they proposed in their opening brief: providing Petitioners and their counsel with full transparency into Madwell, with such transparency extending to matters pertaining to the Investigation and the plane. Dkt. 23-1 at 25. If after receiving and reviewing the relevant documents and information, Petitioners still have concerns, they can raise them. The only thing Madwell and Mr. Sojka are not willing to do is permit Petitioners to derail or delay the Investigation—or their ongoing provision of documents and information to DOJ—through their bad faith Petition.

## ARGUMENT

### A. The Petition Should Be Dismissed Based on Petitioners' Repeated Use of the Petition as a Tool for Coercion

The Petition should be dismissed based on its improper purpose: to coerce a payment from Mr. Sojka in his personal capacity for alleged debts of Madwell for which he has no personal liability. Petitioners' arguments to the contrary—that (i) Mr. Naujelis's text exchange with Mr. Sojka can be read as something other than a *quid pro quo* offer to dismiss this Petition

in exchange for a payment from Mr. Sojka, Dkt. 29 at 3, and (ii) even if a *quid pro quo* offer, the exchange supposedly constituted only an isolated *quid pro quo* offer, *id.*—are flatly contradicted by the following undisputed facts:

- On October 15, 2025, Madwell's counsel explained to Petitioners' counsel during their initial discussion that Madwell lacked assets to pay Petitioners what they were demanding, offered to provide them with full transparency into Madwell, and requested that they hold off on filing the Petition so as not to disrupt the Investigation into the seeming fraud, Dkt. 25 at ¶ 5;

- The next day, October 16, 2025, Petitioners' counsel sent Madwell's counsel emails in which Petitioners' counsel (i) rejected the above offer and request, Dkt. 25-2 at 10–11, (ii) threatened to file the Petition on October 22, 2025 "[i]f by that time there is no offer on the table for our group – either cash, or some kind of accelerated interest in a third party asset," *id.*, and (iii) bluntly stated, "Before we jump on another call, we'd like a proposal to take to our clients. Money Talks. Your client [Mr. Sojka[3]] has assets," *id.* at 9;

- On October 21 and 22, 2025, Petitioners' counsel sent emails to Madwell's counsel inquiring about various assets, including the plane, *id.* at 6–8;

- On October 23, 2025, Madwell's counsel responded to the inquiries, conveying his understanding that the funds Mr. Sojka used to obtain his interest in the assets, including his interest in the airplane, properly were characterized as his personal funds, not Madwell funds, and thus the assets were not a potential source of funds to pay Petitioners, *id.* at 4–5;

- On November 10, 2025, Petitioners' counsel emailed Madwell's counsel stating, "I gather your client (Sojka) sold the jet . . . . You have a moment to discuss?" *Id.* at 3–4;

- On November 11, 2025, before counsel could connect, Mr. Naujelis had his text exchange with Mr. Sojka, which cannot be read as anything other than conveying a *quid pro quo* offer:

    - Mr. Naujelis: "The jet has been sold. When should I expect payment?"

    - Mr. Sojka: "You do realize you are currently participating in a motion to force Chapter 7 liquidation of Madwell, yes?"

---

[3] The reference to "Your client" plainly was a reference to Mr. Sojka. Indeed, that is how Petitioners' counsel referred to Mr. Sojka in other communications. *See* Dkt. 25-2 at 3 ("I gather your client (Sojka) sold the jet").

- Mr. Naujelis: "It could go away if we were to get paid what we're rightly owed." Dkt. 25-3;

- The next day, November 12, 2025, Petitioners' counsel and Madwell's counsel had the call Petitioners' counsel had requested when he sent his November 10 email with the text, "I gather your client (Sojka) sold the jet . . . .You have a moment to discuss?" On that call, Petitioners' counsel conveyed by phone to Madwell's counsel substantively *the same quid pro quo message* that Mr. Naujelis had conveyed to Mr. Sojka the day before. Petitioners do not dispute that the following occurred on the call:

    - Petitioners counsel stated he requested the call to discuss that (i) the bankruptcy proceeding was in the "gap period" where it could be dismissed, (ii) Petitioners could not at that point seek payment from Madwell directly, but (iii) a third party could pay to get Madwell out of bankruptcy, Dkt. 25 at ¶ 7;

    - After Madwell's counsel did not engage in response to the clear suggestion that Mr. Sojka could pay Petitioners to obtain a dismissal of the Petition, the call ended, *id*.

The above undisputed account makes clear that (like the petitioners in *In re Valuex*) Petitioners here first sought to use the threat of filing the Petition to extract a payment from Mr. Sojka in his individual capacity for debts allegedly owed by Madwell. *See* 2024 WL 4188464, at *3, *8–9. Indeed, after being told on October 15, 2025 that Madwell itself lacked assets to pay Petitioners what they were demanding, *see* Dkt. 25 ¶ 5, Petitioners threatened to file the Petition unless Mr. Sojka made them an offer, with their counsel bluntly stating, "Money talks. Your client has assets." *See* Dkt. 25-2 at 9, 11. Even worse, when that tactic failed, Petitioners filed the Petition and then sought to use the prospect of its dismissal (during what Petitioners' counsel identified as the "gap period") as a further "tool of coercion" to induce a payment from Mr. Sojka. *In re Valuex*, 2024 WL 4188464, at *9. Petitioners' argument that "[t]here is no way that the instant bankruptcy filing can benefit the Petitioners over other creditors," Dkt. 29 at 2, thus is wrong. It was wrong when Petitioners used the threat of filing the Petition to try to obtain a payment from Mr. Sojka—the same conduct that prompted the court in *In re Valuex* to dismiss

that petition. It also was wrong when Petitioners subsequently filed the Petition and then used the prospect of the Petition's dismissal in the "gap period" to try to obtain the same improper benefit.

Accordingly, as in *In re Valuex*, "the public interest in 'preventing parties from exploiting the bankruptcy system for non-bankruptcy reasons'" supports dismissing the Petition here. 2024 WL 4188464, at *9 (quoting *In re Murray*, 900 F.3d 53, 63 (2d Cir. 2018)). Also as in *In re Valuex*, "[i]f [Petitioners' *quid pro quo* offers] had succeeded, [they] would have put . . . [the] petitioning creditors in a preferential position relative to [Madwell's] other creditors, something deeply at odds with the equitable purpose of bankruptcy." *Id.* The "strong public interest in preventing the threat of bankruptcy from being used as a tool of coercion" thus warrants dismissal. *Id.*

Moreover, contrary to Petitioners' contention, *see* Dkt. 29 at 21–23, many of the *Forever Green* factors support dismissal here. Petitioners' conduct demonstrates that they used the Petition to try to "obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same" and as "a substitute for customary debt-collection procedures." *In re Forever Green*, 804 F.3d at 336. Mr. Naujelis's unsolicited post-filing texts to Mr. Sojka, a then-represented party, likewise suggest that the "filing was motivated by ill will or a desire to harass." *Id.* Moreover, the "suspicious timing" of Petitioners' coercive communications—coming shortly before and then, again, shortly after the $4.1 million BOA Judgment was poised to be entered against Madwell—also indicates that Petitioners intended to use their pre-filing *quid pro quo* communications, the filing of the Petition, and their post-filing *quid pro quo* communications as tactical maneuvers to try to coerce payment from Mr. Sojka as

an end-run around the BOA judgment.[4]

Petitioners also argue, unavailingly, that abstention under Section 305(a)(1) of the Bankruptcy Code is not warranted here, contending that the factors enumerated in *In re Paper I Partners, L.P.*, 283 B.R. 661, 678–79 (Bankr. S.D.N.Y. 2002), do not "justify abstention." Dkt. 29 at 23–24. But several of the *In re Paper I Partners* factors show that dismissal is in the best interests of the creditors and the debtor, including the "economy and efficiency of administration," "[w]hether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case," and "[t]he purpose for which bankruptcy jurisdiction has been sought." 283 B.R. at 679. As explained in Madwell's opening brief, "Madwell's creditors . . . are benefiting from an Investigation that is being conducted by a former AUSA with substantial experience investigating and successfully pursuing claims in connection with complex fraud schemes," and pushing Madwell into bankruptcy "risk[s] . . . derailing . . . the Investigation [and] adding cost ahead of legitimate creditors" in the form of a trustee who "will necessarily take a significant cut of any recovery off the top." Dkt. 23-1 at 24–25. *That DOJ is involved—and Petitioners and their counsel have been offered and can obtain full access to all relevant information—provides further compelling reasons why dismissal or, at a minimum, abstention is appropriate here.*

**B. Petitioners' Tainted Petition Cannot Be Saved by the Joinder of Additional Alleged Creditors**

Presumably recognizing that the Petition was tainted by its improper *quid pro quo* purpose, Petitioners scrambled to add additional creditors in a futile effort to try to cure the taint. Indeed, within hours of this Court granting Madwell's motion to extend its time to respond to the

[4] Petitioners' attempts to excuse that two of the Petitioners are creditors of Starfish, not Madwell, Dkt. 29 at 18–19, also reflect that Petitioners failed to conduct a reasonable inquiry before filing the Petition. *See* Dkt. 23-1 at 23–24.

Petition precisely so Madwell could raise the bad faith dismissal arguments it raises here, Petitioners' counsel started scrambling to join additional creditors. *See* Dkt. 19–21, 28. Under the bar-to-joinder doctrine, however, the "bad faith [of the original Petition] bars joinder of other petitioning creditors." *See Forever Green Athletic Fields, Inc. v. Dawson*, 514 B.R. 768, 789 (E.D. Pa. 2014), *aff'd sub nom. In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).

Although Petitioners characterize the bar-to-joinder doctrine as "bad, superseded law," Dkt. 29 at 19, it is not. Petitioners' assertion that the Second Circuit has "revisited" the doctrine, Dkt. 29 at 20, likewise is unsupported. Neither the case Petitioners cite to support that assertion, *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010), nor the case *In re Zarnel* abrogated, *In re BDC 56 LLC*, 330 F.3d 111(2d Cir. 2003), even addresses the bar-to-joinder doctrine, much less overrules it.[5] The other cases Petitioners cite, *In re FKF Madison Park Grp. Owner, LLC*, 435 B.R. 906 (Bankr. D. Del. 2010), and *In re Kidwell*, 158 B.R. 203 (Bankr. E.D. Cal. 1993), stand only for the uncontroversial proposition that the bar-to-joinder doctrine "is not universally adopted." Dkt. 29 at 19. As the *Forever Green* court noted in 2014, however, the doctrine is "the majority rule," 514 B.R. at 789; *see, e.g.*, *In re Mylotte, David & Fitzpatrick*, No. 07-11861BIF, 2007 WL 2033812, at *8–12 (Bankr. E.D. Pa. July 12, 2007) (barring joinder of four subsequent petitioning creditors where initial petitioning creditor filed Chapter 7 petition in bad faith); *In re Centennial Ins. Associates, Inc.*, 119 B.R. 543, 546–47 (Bankr. W.D. Mich. 1990) (holding that "the intervention of a subsequent good faith creditor does not remove the taint of an original bad

---

[5] *Zarnel* addressed whether the bankruptcy case at issue there "commenced" when debtors filed their bankruptcy petitions and thus activated the bankruptcy court's jurisdiction and the protections of the automatic stay, *see* 619 F.3d at 164–72, whereas *BDC* addressed whether the requirement that claims of petitioning creditors not be subject to *bona fide* disputes is jurisdictional in nature, *see* 330 F.3d at 118–19.

faith petitioning creditor"); *Basin Elec. Power Co-op. v. Midwest Processing Co.*, 769 F.2d 483, 486–87 (8th Cir. 1985) (same).

Indeed, the contemporary bankruptcy treatises recognize what the case law bears out: that "[t]he majority of bankruptcy courts have adopted this [bar-to-joinder] approach." 3 Hon. Joan N. Feeney & Michael J. Stepan, *Bankruptcy Law Manual* § 14:13 (5th ed., Dec. 2025 Update); 1 William L. Norton III, *Norton Bankr. L. & Prac.* § 22:8 (3d ed., Jan. 2026 Update) ("The overwhelming majority of courts . . . apply a judicially created bad-faith exception to § 303(c)."). The doctrine remains the majority approach for good reason: to avoid incentivizing creditors (like the Petitioners here) to file a petition in bad faith. If creditors like the Petitioners here know that they can avoid the consequences of a bad faith dismissal merely by having their counsel round up three additional creditors if and when they are called on their bad faith acts, they will have little incentive to abstain from such acts. Petitioners here should not be given a pass by allowing them to join additional creditors—who all are represented by the same Petitioners' counsel—as a means to cure the taint of their bad faith conduct.

Petitioners also argue that "[f]urther discovery is unwarranted and would only serve to waste time and resources." Dkt. 29 at 25. To the contrary, discovery is very much warranted here for the reasons discussed in Madwell's opening brief, *see* Dkt. 23-1 at 25–26, and also to further explore the improper motivation of Petitioners to use the Petition to coerce Mr. Sojka to pay them, including any coordination among Petitioners regarding communications to Mr. Sojka and any involvement by the new putative creditors of Madwell who now seek to join the Petition.

### C. Petitioners Have Ignored Madwell and Mr. Sojka's Repeated Offers of Transparency

Presumably to distract from their improper *quid pro quo* conduct, Petitioners try to sully Mr. Sojka by (i) pointing to allegations made by his former business partner in the context of a

litigation between the two of them, and (ii) using those allegations to suggest that Mr. Sojka is objecting to the Petition because he wants to avoid transparency. Setting aside that the allegations to which they point are just that—allegations made by a litigation adversary who Mr. Sojka likewise has accused of misconduct—the allegations ultimately are irrelevant because Mr. Sojka is not looking to avoid scrutiny of Madwell, the plane, his expenditures, or anything else.

To the contrary, the record confirms that Mr. Sojka wants scrutiny—of Madwell, himself, others as appropriate, the plane, and anything else that will (i) get to the bottom of the discrepancies in the revenue figures included in Madwell's opening brief and other items of seeming concern identified in the Investigation, and (ii) dispel any suggestion he acted in a way contrary to the best interests of Madwell or its former clients, service providers, or employees. That is why Mr. Sojka:

- Initially reported the seeming fraud at Madwell to DOJ—in the hopes and with the expectation that it would lead to the most intrusive of scrutiny possible, a DOJ investigation;

- has since been actively producing documents and information to DOJ;

- retained undersigned counsel—a former DOJ official with substantial experience investigating fraud—to simultaneously investigate the seeming fraud, liaise with DOJ, and evaluate whether civil claims can be brought on behalf of Madwell;

- has continually offered to produce relevant documents and information, including about Madwell, the plane, and the Investigation, to Petitioners and their counsel; and

- based on the red flags of potential fraud that the Investigation thus far has uncovered, will be retaining a forensic accountant to evaluate those red flags (and all other aspects of Madwell) from a forensic accounting perspective. Consistent with his approach with Petitioners to date, Mr. Sojka is willing to involve Petitioners and their counsel in the process.[6]

[6] Like the other supposed "facts" to which Petitioners point, that Mr. Sojka objected to his litigation adversary's having unilaterally retained a forensic accountant during the context of

Like the rest of Petitioners' arguments, the overall theme of Petitioners' Opposition—that a trustee needs to be appointed because (i) Mr. Sojka supposedly is "trying to prevent . . . [an] investigat[ion of] the [seeming] insider fraud," Dkt. 29 at 3, (ii) Mr. Sojka supposedly "will go to any lengths" to prevent such an investigation, *id.* at 4, and (iii) an investigation by Mr. Sojka's counsel supposedly will be "self-serving" and cannot be trusted, *id.*—fails based on the undisputed record. If Petitioners do not trust Mr. Sojka and his counsel, they can trust DOJ. If they do not trust DOJ, then they can accept Mr. Sojka and Madwell's repeated offers and obtain and review all of the documents and information they would need (*i.e.*, the same documents and information to which a trustee would have access) to evaluate whether Mr. Sojka (i) engaged in any wrongdoing, (ii) received any preferential payments, including in connection with the plane,[7] and (iii) is acting in the best interests of Madwell's creditors.

That Petitioners to date have ignored these offers while making baseless assertions that Mr. Sojka is seeking to avoid transparency only reinforces Mr. Sojka and Madwell's concern over their true motives. Indeed, Petitioners seem more concerned with having a trustee appointed so they can avoid the dismissal that should result from their *quid pro quo* scheme—and the consequences that would flow to them from such a dismissal—than with ensuring that the best course of action is followed to ensure that seeming fraud is fully investigated and, to the extent a fraud occurred and claims can be pursued against those responsible, that such claims are pursued.

---

their prior dispute, Dkt. 29 at 5, did not reflect a desire by Mr. Sojka to avoid transparency. Rather, it reflected a distrust of his litigation adversary.

[7] In a constant refrain, Petitioners miscite the pleadings from the prior litigation between Mr. Sojka and his former business partner to suggest that Mr. Sojka previously took the position that the plane was a Madwell asset. What the memorandum of law that Petitioners cite actually shows is that "Madwell's potential acquisition of an aircraft . . . was contemplated in the past," that a transaction for a plane unrelated to the plane at issue "[fell] through," and that at the time of the memorandum, "neither Mr. Sojka nor his executives [were] proceeding" with the plan to acquire a plane. Dkt. 30-6 at 2.

## CONCLUSION

For the foregoing reasons, the Court should grant Madwell's Motion to Dismiss the Petition.

Dated: February 13, 2026
New York, New York

MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P.C.

/s/ *Christopher B. Harwood*
Christopher B. Harwood
565 Fifth Avenue
New York, New York 10017
Tel: (212) 856-9600
Fax: (212) 856-9494
charwood@maglaw.com

*Counsel to Madwell LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2026, a true and correct copy of the foregoing Alleged Debtor's Reply to Petitioner's Opposition to Alleged Debtor's Motion to Dismiss has been served on all counsel of record via electronic filing with the Clerk of Court using the CM/ECF system.

Dated: February 13, 2026
New York, NY

/s/ *Christopher B. Harwood*

Christopher B. Harwood
Morvillo Abramowitz Grand Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
Tel: 212-856-9547
Fax: 212-856-9494
charwood@maglaw.com

*Counsel for Madwell LLC*